IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Christian Labor Association; Kaski Inc.; Nordic Group Inc.; Roen Salvage Co.; Luke Krhin; Shawn Kunnari; and Dylan Smith, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 0:21-cv-00227-DWF-LIB |
| City of Duluth; City of Cloquet; City of Two Harbors; Western Lake Superior Sanitary District; and Duluth Building and Construction Trades Council, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINT PURSUANT
TO F.R.C.P. 12(b)(1) AND F.R.C.P. 12(b)(6)**

*\* See list of counsel, next page*

REBECCA ST. GEORGE, CITY
ATTORNEY, and
 *s/ Elizabeth A. Sellers*
Elizabeth A. Sellers (0395652)
Assistant City Attorney
411 West First Street, Rm. 440
Duluth, MN  55802
(218) 730-5281
esellers@duluthmn.gov

*Attorneys for Defendant City of Duluth*


GREENE ESPEL PLLP
 *s/Monte A. Mills*
Monte A. Mills (030458X)
Davida S. McGhee (0400175)
222 S. Ninth Street, Suite 220
Minneapolis MN 55402
(612) 373-0830
mmills@greeneespel.com
dwilliams@greeneespel.com

*Attorneys for Defendants City of
Cloquet, City of Two Harbors,
Western Lake Superior Sanitary District*

ANDREW, BRANSKY AND POOLE,
P.A.
 *s/ Timothy W. Andrew*
Timothy W. Andrew (227250)
302 West Superior Street, Suite 300
Duluth MN, 55802
(218) 722-1764
timandrew@duluthlawfirm.com

SHERMAN DUNN, P.C.
 *s/ Victoria L. Bor*
Victoria L. Bor  (D.C. #288852)
Jonathan D. Newman (D.C. #449141)
Robert D. Kurnick (D.C. #243683)
900 Seventh Street, N.W.  Suite 1000
Washington, D.C.  20001
(202)785-9300
bor@shermandunn.com
newman@shermandunn.com
kurnick@shermandunn.com

*Attorneys for Defendant Duluth Building
& Construction Trades Council*

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................ 1

II.  STATEMENT OF FACTS .................................................. 1

     A.   Background on PLAs ............................................... 1

     B.   The Public Entities and the PLAs .............................. 2

          1.   *City of Duluth* ............................................. 2

          2.   *City of Cloquet* ........................................... 4

          3.   *City of Two Harbors* ...................................... 5

          4.   *Western Lake Superior Sanitary District* ................. 6

     C.   Plaintiffs ......................................................... 6

III. *ARGUMENT* ................................................................ 7

     A.   The Complaint Must be Dismissed under Rule 12(b)(1)
          for Lack of Subject Jurisdiction ............................... 7

          1.   *Plaintiffs Lack Standing.* ................................ 8

               a.   *Employee Plaintiffs Lack Standing.* ................. 8

               b.   *Christian Labor Council Lacks Standing.* ........... 14

               c.   *Contractor Plaintiffs Lack Standing.* .............. 15

          2.   *Plaintiffs' Claim that the PLAs Require
               "Membership" or Payment of Fees are Moot.* .............. 20

     B.   The Complaint Must be Dismissed under Rule 12(b)(6)
          for Failure to State any Claims for Which Relief can be
          Granted. ........................................................ 23

          1.   *Plaintiffs Have Failed to State a Claim for Violation
               of the Employees' First and Fourteenth Amendment
               Rights.* ................................................... 23

2.      *Plaintiffs Have Failed to State a Claim for Violation of the Antitrust Laws.* ....................................... 25

    *a. The Complaint does not State a Violation of the Sherman Act.* ..................................................... 25

    *b. Plaintiffs do not Have Antitrust Standing.* ........................... 28

        1)   Individual Employee Plaintiffs Lack Antitrust Standing. .......................................... 29

        2)   CLA Lacks Antitrust Standing ...................................... 31

        3)   Contractor Plaintiffs Lacks Antitrust Standing. ........................................................ 32

    *c.* The PLAs are Shielded from Antitrust Scrutiny by the Nonstatutory Labor Exemption.................................... 33

CONCLUSION ..................................................................................... 37

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors v. Pena*,
    515 U.S. 200 (1995) ................................................................................................... 17

*Ass'd Builders & Contractors of Western Pa. v. Community College of
    Allegheny Co.*,
    Docket No. 2:20-cv-649 (W.D. Pa.) ........................................................................ 22

*Ass'd Builders & Contractors of Western Pa. v. County of Westmoreland*,
    Docket No. 2:19-cv-1213 (W.D. Pa.) ...................................................................... 22

*Ass'd Builders & Contractors of Western Pa. v. Plum Borough*,
    Docket No. 2:20-cv-01933 (W.D. Pa.) .................................................................... 22

*Ass'd Builders v. City of Seward*,
    966 F.2d 492 (9th Cir. 1992) ................................................................................... 36

*Ass'd Gen. Contractors of Cal. v. Carpenters*,
    459 U.S. 519 (1983) ........................................................................................... *passim*

*Bathke v. Casey's Gen. Stores, Inc.*,
    64 F.3d 340 (8th Cir. 1995) ..................................................................................... 27

*Bierman v. Dayton*,
    900 F.3d 570 (8th Cir. 2018) ............................................................................ 12, 24

*Bldg. & Constr. Trades Council v. Ass'd Builders and Contractors*,
    507 U.S. 218 (1993) ........................................................................................... *passim*

*Bldg. Indus. Elec. Contractors Ass'n v. City of New York*,
    678 F.3d 184 (2nd Cir. 2012) .................................................................................. 35

*Blue Shield of Va. v. McCready*,
    457 U.S. 465, 476-77 (1982). .................................................................................. 29

*Breininger v. Sheet Metal Workers Local 6*,
    493 U.S. 67 (1987) ................................................................................................... 24

iii

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ................................................................. 27, 36

*Brown v. Pro Football Inc.*,
    518 U.S. 231 (1996) ........................................................ 33, 34, 36

*Brown Shoe Co. v. United States*,
    370 U.S. 294, 320 (1962) ............................................................. 27

*Brunswick Corp. v. Pueblo Bowl-O-Mat*,
    429 U.S. 477, 488 (1977) ........................................................ 26, 29

*Carney v. Adams*,
    141 S.Ct. 493 (2020) ............................................................. 18, 19

*Communications Workers v. Beck*,
    487 U.S. 735 (1988) .............................................................. 10, 11

*Connell Constr. Co. v. Plumbers & Steamfitters Local 100*,
    421 U.S. 616 (1975) .............................................................. 33, 36

*Double D Spotting Serv. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ................................................... 27, 28

*Ehredt Underground, Inc. v. Commonwealth Edison Co.*,
    90 F.3d 238 (7th Cir. 1996) .................................................. *passim*

*Fleck v. Wetch*,
    937 F.3d 1112 (8th Cir. 2019) ..................................................... 12

*Gratz v. Bollinger*,
    539 U.S. 224 (2003) ................................................................ 17

*Hoekman v. Educ. Minn.*,
    No. 18-cv-01686, 2021 WL 533683 (D. Minn. Feb. 12, 2021)
    (Nelson, J.)........................................................................ 22

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .............................................................. 13, 14

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
    797 F.3d 538 (8th Cir. 2015) ...................................................... 29

*Janus v. American Federation of State, County and Municipal
    Employees, Council 31*,
    138 S. Ct. 2448, 2485 (2018) ............................................ 10-11, 23, 24

iv

*Johnson v. Rancho Santiago Cmty. Coll. Dist.*,
    623 F.3d 1011 (9th Cir. 2010) ................................................... 35

*Libertarian Party of Ark. v. Martin*,
    876 F.3d 948 (8th Cir. 2017) ............................................... 20, 21

*Little Rock Cardiology Clinic Pa. v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) ..................................................... 28

*Loescher v. Minn. Teamsters Pub. & L. Enf't Employees' Union, Loc. No. 320*,
    441 F. Supp. 3d 762 (D. Minn. 2020) (Wright, J.) ................................ 15, 22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................ 7, 11, 13, 18

*Marquez v. Screen Actors Guild*,
    525 U.S. 33 (1998) .................................................. 9, 10, 14

*Mausolf v. Babbitt*,
    85 F.3d 1295 (8th Cir. 1996) ..................................................... 7, 13

*McCarthy v. Ozark Sch. Dist.*,
    359 F.3d 1029 (8th Cir. 2004) .................................................. 7, 21

*Meat Cutters Local 576 v. Wetterau Foods, Inc.*,
    597 F.2d 133 (8th Cir. 1979) ..................................................... 34

*Minn. State Bd. for Cmty Colleges v. Knight*,
    465 U.S. 271 (1984) .............................................................. 24

*Moore v. Thurston*,
    928 F.3d 753 (8th Cir. 2019) ..................................................... 22

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ..................................................... 29

*Northeastern Florida Chapter, AGC v. City of Jacksonville*,
    508 U.S. 656 (1993) ......................................................... 15, 16, 17

*Osborn v. United States*,
    918 F.2d 724 (8th Cir.1990) ...................................................... 7

*Peterson v. Gen. Motors Corp.*,
    975 F.2d 518 (8th Cir. 1992) .................................................. 29, 30

v

*Phelps-Roper v. City of Manchester*,
    697 F.3d 678 (8th Cir. 2012) (en banc) ........................................ 20, 21, 22

*Prowse v. Payne*,
    984 F.3d 700 (8th Cir. 2021) ..................................................... 20

*Quinn v. Millsap*,
    491 U.S. 95 (1989) ................................................................. 17

*Razorback Ready Mix Concrete Co. v. Weaver*,
    761 F.2d 484 (8th Cir. 1985) ................................................. 26, 28

*Road-Con v. City of Philadelphia*,
    Docket No. 2:19-cv-1667 (E.D. Pa.) ......................................... 22

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ................................................... 27

*S.D. Collectibles, Inc. v. Plough, Inc.*,
    952 F.2d 211 (8th Cir. 1991) ................................................... 30

*Sierra Club v. Robertson*,
    28 F.3d 753 (8th Cir. 1994) ......................................... 8, 12, 13, 16

*Teague v. Cooper*,
    720 F.3d 973 (8th Cir. 2013) ................................................ 20, 21

*The Branson Label, Inc. v. City of Branson*,
    793 F.3d 910 (8th Cir. 2015) ................................................... 8

*Vorchheimer v. Philadelphia Owners Ass'n*,
    903 F.3d 100 (3d Cir. 2018) .................................................... 14

*Warth v. Seldin*,
    422 U.S. 490 (1975) ......................................................... 15, 16, 17

**Federal Statutes and Constitutional Provisions**

Clayton Act, 15 U.S.C. § 15(a) ..................................................... 28

National Labor Relations Act

    29 U.S.C. § 151 ................................................................. 33

    29 U.S.C. § 158(a)(3) ............................................................ 9

29 U.S.C. § 158(f) ............................................................... 1, 2, 9, 24, 30

29 U.S.C. § 158(e) ...................................................................... 1, 2, 36

Sherman Act ............................................................................... *passim*

15 U.S.C. § 1 ...................................................................................... 25

15 U.S.C. § 2 .............................................................................. 25, 28

U.S. Constitution

First Amendment ...................................................................... 1, 24

Fourteenth Amendment ............................................................. 8, 23

## State and Local Statutes

Cloquet, Minn. Code § 9.2.01 (2021) .................................................. 4

Duluth, Minn. Code § 2-29(a) (2021) .............................................. 2, 3

Minn. Stat. § 458D.03, subd. 1 (2021) ............................................... 6

Two Harbors, Minn. Code § 2.77 (2021) ............................................ 5

## Other Authorities

Fed. R. Civ. P. Rule 12(b)(1) ..................................................... 1, 7, 36

Fed. R. Civ. P. Rule 12(b)(6) ................................................... 1, 23, 36

U.S. Gen. Accounting Office, *Project Labor Agreements: The Extent of the Use and Related Information*, Pub. No. GAO/GGD-98082 (1998) ............................. 2

## I.     INTRODUCTION

Plaintiffs' Complaint challenges project labor agreements ("PLAs") of four public entities: the cities of Duluth, Cloquet and Two Harbors and the Western Lake Superior Sanitary District (collectively, "the Public Entities"). The PLAs were negotiated by, and are between, the Public Entities and the Duluth Building and Construction Trades Council ("the Building Trades").  Plaintiffs claim the PLAs violate the First and Fourteenth Amendments and antitrust laws. Defendants move to dismiss under Rule 12(b)(1), for lack of subject matter jurisdiction because Plaintiffs have failed to establish this Court's jurisdiction over their claims: They lack standing, and their claims are moot. Alternatively, Defendants move to dismiss under Rule 12(b)(6), for failure to state any claims upon which relief may be granted: Plaintiffs have not alleged viable claims under either the Constitution or the Sherman Act.

## II.     STATEMENT OF FACTS

### A.     Background on PLAs.

PLAs are pre-hire collective bargaining agreements that establish the terms and conditions of employment for an entire construction project.  PLAs are common in the construction industry, where the short-term nature of employment impedes post-hire collective bargaining and contractors need predictable costs and a steady supply of skilled labor.  In the private sector, these agreements are specifically authorized through Sections 8(e) and (f) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e) and (f). *Bldg. & Constr. Trades Council v. Ass'd Builders and Contractors* ("*Boston Harbor*"),

507 U.S. 218, 230 (1993).[1]  Governmental entities have also long used PLAs to facilitate their construction projects.[2]  In *Boston Harbor*, the Supreme Court held that when a public owner, acting in its proprietary capacity, chooses to use a PLA on its public works projects, it is "condition[ing] its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find," and thus, is "exemplif[ying]" "the workings of the market forces that Congress expected to find."  *Id.* at 233.

## B.    The Public Entities and the PLAs.

### 1.    *City of Duluth*

When Duluth has a "direct interest in [the] financial performance" of a construction project, it has "a compelling interest in ensuring [the project] proceed[s] in a timely, cost-effective manner with the highest degree of quality and with minimal delays and disruptions."  Duluth, Minn. Code § 2-29(a) (2021).  To serve that interest, Duluth's policy is to require a PLA, "in substantially the form adopted by resolution of the council from time to time and kept by the city clerk as a public document, . . . to be used on each

---

[1] Section 8(f) permits construction employers and unions to enter into collective bargaining agreements before the employer hires its workforce. The construction industry proviso to Section 8(e) permits parties to a prehire agreement "to require employers not to hire other contractors to perform work on that particular project unless they agree to become bound by the terms of that labor agreement." *Boston Harbor*, 507 U.S. at 223.

[2] *See, e.g.,* U.S. Gen. Accounting Office, *Project Labor Agreements:  The Extent of the Use and Related Information* at 4, Pub. No. GAO/GGD-98082 (1998) (tracing the use of PLAs on federal and other publicly funded projects back to the construction of the Grand Coulee Dam in Washington State in 1938 and the Shasta Dam in California in 1940), available at https://www.gao.gov/assets/ggd-98-82.pdf.

covered project." *Id.* § 2-29(b).  The agreement is to "be made binding on all contractors and subcontractors working on the project[, but n]o contractor shall be required to be or become a party to a collective bargaining agreement on any other construction project in order to qualify to work under [the PLA.]" *Id.*

Duluth has used various form PLAs. *See* Complaint ("Compl.") Ex. 1 (ECF No. 1-1) and Ex. 4 (ECF No. 1-4).  Each of these agreements makes clear that any contractor can bid for and be awarded work on a covered project, regardless whether it otherwise has an agreement with a signatory union, as long as the contractor is willing to "become a party to and comply with" the PLA.  Compl. Ex. 1, Art. II § 5; Compl. Ex. 4, Art. II § 5.  Each form agreement has required contractors to recognize the signatory unions as the exclusive collective bargaining agent of their employees on the project, and to secure their employees through the unions' referral systems, which the unions commit to operate "in a non-discriminatory manner and in full compliance with Federal and State laws."  Complaint (ECF No. 1) ¶¶ 20, 21, 22; Compl. Ex. 1, Art. III § 1 and Art. IV; Compl. Ex. 4, Art. III § 1 and Art. IV.  One of Duluth's form agreements contained a union security clause, stating that employees must be "members of the Union in good standing" while working on the project.  Compl. Ex. 1, Art. III § 2. These are all provisions commonly found in PLAs.  Compl. ¶ 16; *see also Boston Harbor,* 507 U.S. at 221-22 (describing the terms of the Massachusetts Water Resources Authority's PLA).

On March 22, 2021, the City Council met and, by resolution, amended the PLA to be used on the city's covered projects.  Declaration of Chelsea J. Helmer ("Helmer Decl.") ¶ 4 and Ex. A (Resolution 21-0196R and amended Duluth Form PLA).  The

resolution, supported by the Building Trades, passed by a unanimous vote. *Id.*;

Declaration of Craig Olson ("Olson Decl.") ¶ 6 and Ex. 3 (Letter from Olson to Duluth

Mayor and City Council Members). As amended, the PLA specifically provides that,

"[n]othing in this Agreement requires employees to join a union or pay dues or fees to a

union as a condition of working on the covered project." Helmer Decl., Ex. A (Duluth

Form PLA, Art. II § 9). In addition, a provision in one of Duluth's form agreements

which previously required employees to "become" and "remain members of the Unions

in good standing during the term of this Agreement" has been stricken in its entirety. *See*

*id.* at 4 (former Art. III § 2).

### 2.    *City of Cloquet*

Cloquet similarly recognizes that using PLAs serves its interests when conducting

construction projects. Cloquet, Minn. Code § 9.2.01 (2021). It accordingly requires a

PLA on any project "with a total City investment of $175,000 or more." *Id.* § 9.2.02. The

city's code specifies that the PLA must be binding on all contractors and subcontractors

operating on a covered project, but only on that project, and that no contractor or

subcontractor will be required to "be or become" a party to any other bargaining

agreement as a condition of working on a covered project. *Id.* Cloquet's form PLA

permits any contractor willing to accept its terms to bid for and be awarded work on a

covered project. Compl. Ex. 1-2, Art. II § 5. It requires contractors to recognize the

signatory unions as their employees' exclusive collective bargaining agents while

working on the project and to secure their employees through the unions' referral

systems. *Id.*, Art. III § 1, Art. IV.

4

On March 16, 2021, and by unanimous vote, the Cloquet City Council adopted a resolution amending the form PLA to "clarify that the agreement does not require employees to join a union or pay dues or fees" while working on a covered project. Declaration of Tim Peterson ("Peterson Decl.") ¶¶ 3,4 and Ex. A (Resolution No. 21-16 and amended Cloquet Form PLA) at 3, 4.  The Building Trades supported this amendment.  Olson Decl. ¶ 6 and Ex. 1 (Letter from Olson to Peterson).

### 3.    *City of Two Harbors*

Two Harbors' code requires the use of a PLA "on each City construction project, with a total estimated cost of $150,000.00 or more."  Two Harbors, Minn. Code § 2.77 (2021).  The code specifies that "[n]o contractor shall be required to be or become a party to a collective bargaining agreement in order to qualify to work under a [PLA] for a particular City project."  *Id.*  The Two Harbors PLA requires all contractors operating on a covered project to abide by the agreement's terms, to recognize the signatory unions as their employees' exclusive bargaining representative, and to hire their work crews through the unions' referral systems.  Compl. Ex. 3 (ECF No. 1-3), Art. III § 1 and Art. IV.

A prior version of Two Harbors' form PLA required employees who were already union members to remain members while working on a covered project.  *Id.,* Art. III § 2. On March 22, 2021, the Two Harbors City Council adopted a resolution amending its "form PLA to reflect that the City does not require [any] workers to join a union or pay union fees as a condition of working on a City project." Declaration of Dan Walker ("Walker Decl."), Ex. A (Resolution 3-86-21).  The form PLA specifically states,

"[n]othing in this Agreement requires employees to join a union or pay dues or fees to a union as a condition of working on the covered project," and eliminates the prior provision requiring union members to maintain their membership while working on the covered project. *See id.,* Exhibit A at 3, 4. The resolution further directs Two Harbors to "use the form [PLA], as amended by this Resolution, for any project where the City enters into a [PLA]." *Id.* The Building Trades supported this amendment. Olson Decl. ¶ 6 and Ex. 2 (Letter from Olson to Walker).

### 4.    *Western Lake Superior Sanitary District*

The Western Lake Superior Sanitary District ("the Sanitary District") is a "public corporation and political subdivision of the state" of Minnesota, established by statute. Minn. Stat. § 458D.03, subd. 1 (2021). The Sanitary District's PLA contains no provisions requiring employees to join or financially support the Building Trades' affiliated unions. Declaration of Marianne Bohren, Ex. A. Like the current versions of the PLAs adopted by Duluth, Cloquet and Two Harbors, the Sanitary District's PLA expressly states "[n]othing in this Agreement requires employees to join a union or pay dues or fees to a union as a condition of working on the covered project." *Id*.

### C.    Plaintiffs

Luke Krhin and Dylan Smith (collectively, "Employee Plaintiffs") are construction workers. Compl. ¶¶ 7, 9.[3] Krhin is a member of the Christian Labor Association ("CLA"), employed by Nordic Group. *Id.* ¶ 7. Smith is a non-union

---

[3] Shawn Kunnari, named as a Plaintiff, *id.* ¶ 8, has withdrawn from this lawsuit. ECF No. 19 (Notice of Dismissal of Shawn Kunnari).

employee of Roen Salvage.  *Id.* ¶ 9.  CLA is a labor organization that is not affiliated with the Building Trades and is not a party to any of the Public Entities' PLAs.  *Id.* ¶ 3, 25.

Kaski Inc., Nordic Group Inc. and Roen Salvage Co. (collectively, "Contractor Plaintiffs") are construction contractors.  Kaski and Nordic Group employ workers affiliated with the CLA, *id.* ¶¶ 4, 5, and Roen Salvage "is a non-union contractor," *id.* ¶ 6.

Plaintiffs object to the terms of the Public Entities' PLAs, yet none of the Contractor Plaintiffs allege they have worked on or bid for work on projects covered by any of the Public Entities' PLAs.  Compl. ¶¶ 32, 34.  Nor do any of the Employee Plaintiffs allege they sought or obtained work on any covered projects, *id.* ¶¶ 35, 36, or paid or were required to pay dues or fees to any union affiliated with the Building Trades, *id.*

## III.   ARGUMENT

### A.   The Complaint Must be Dismissed under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction.

"Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States." *Mausolf v. Babbitt,* 85 F.3d 1295, 1300 (8th Cir. 1996), *quoting Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 465, 475-76 (1982).  The "requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *McCarthy v. Ozark Sch. Dist.,* 359 F.3d 1029, 1035 (8th Cir. 2004).

Plaintiffs bear the burden of establishing the Court's jurisdiction. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992). Because Defendants' Rule 12(b)(1) motion brings a "factual attack" challenging the factual allegations on which subject matter jurisdiction is based, "the court considers matters outside the pleadings and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Osborn v. United States,* 918 F.2d 724, 729 n.6 (8th Cir. 1990). That is, in a factual attack, the nonmoving party does not "enjoy the benefit of the allegations in its pleading being accepted as true." *The Branson Label, Inc. v. City of Branson,* 793 F.3d 910 (8th Cir. 2015).

### 1. *Plaintiffs Lack Standing.*

To establish standing, Plaintiffs must show that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin,* 422 U.S. 490, 519 (1975); *Lujan,* 504 U.S. at 560-61). The "injury-in-fact component . . . requires a showing of 'an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical.'" *Sierra Club v. Robertson,* 28 F.3d 753, 758 (8th Cir. 1994) (quoting *Lujan,* 504 U.S. at 560). "Assertions of potential harm do not satisfy the injury-in-fact test." *Id.* Instead, Plaintiffs must show "the injury is actual or certain to ensue." *Id.*

### a. *Employee Plaintiffs Lack Standing.*

Plaintiff Krhin is a CLA member, employed by Nordic Group, and Plaintiff Smith is a non-union employee of Roen Salvage. Compl. ¶¶ 7, 9. They allege that the Public

8

Entities' PLAs violate their First and Fourteenth Amendment rights by requiring them to join, associate with and/or financially support unions as a condition of working on covered projects. *Id.* ¶¶ 37, 38, 41. They further allege they have standing to assert these constitutional claims because the PLAs "prevent them from working on the defendants' public works projects because they have exercised their constitutional and statutory right to decline membership in a Council-affiliated union," and "compel [them] to obtain employment through the Council-affiliated union's job-referral systems if they want to perform any work in the defendants' public works projects[, . . . ] injuries caused by the defendants' enforcement of the disputed [PLAs]." Compl. ¶ 35. To support these allegations, the Employee Plaintiffs point to templates of PLAs between the Building Trades and the three cities, which they allege include "union security" language requiring employees "to 'become' and 'remain members' of a Council-affiliated union" while working on a covered project and require contractors operating on covered projects to obtain their employees through the Unions' referral systems. *See* Compl. ¶¶ 22, 23.

Assessing whether Plaintiffs have carried their burden of establishing this Court's jurisdiction rests on understanding the nature of their claims. Plaintiffs assert that, to work on any covered project, they would be required to *join* one of the signatory unions, a condition that precludes workers who choose to be non-union or to join a different union from working on a covered project. Compl. ¶ 23, 24. This simply is not true for two reasons.

First, as the Supreme Court has made clear, contractual language requiring "membership" as a condition of employment is a term of art, which incorporates

limitations that safeguard employees' rights. *Marquez v. Screen Actors Guild,* 525 U.S. 33, 46 (1998). NLRA Section 8(a)(3) states it is not an unfair labor practice for "an employer [to make] an agreement with a labor organization . . . to require as a condition of employment *membership* therein." 29 U.S.C. § 158(a)(3) (emphasis added). Section 8(f) explicitly applies the same rule in the construction industry. *Id.* § 158(f). Stated in the affirmative, these provisions "permit[] unions and employers to negotiate an agreement that requires union 'membership' as a condition of employment for all employees." *Marquez,* 525 U.S. at 46.

Despite the statutory language, however, the Court has held that, "an employee can satisfy the membership condition merely by paying to the union an amount equal to the union's initiation fees and dues. . . . In other words, the membership that may be required 'as a condition of employment is whittled down to its financial core.'" *Id.* at 37 (quoting *NLRB v. Gen. Motors Corp.,* 373 U.S. 734, 742 (1963), and referring to *Pattern Makers v. NLRB*, 473 U.S. 95, 106, n. 16, 108 (1985)). The Court has also held that the "financial core" for nonmembers who object is limited to the amount the union uses for collective bargaining, contract administration and grievance adjustment. *Communications Workers v. Beck,* 487 U.S. 735, 745, 762-63 (1988). When faced with the question whether a union acts unlawfully by agreeing to contract language conditioning employment on membership in good standing, "without explaining, in the agreement, this Court's interpretation of that language," the Court held in *Marquez* that it did not. Instead, the Court explained:

> by tracking the statutory language, the clause incorporates all of the refinements that have become associated with that language. When we interpreted § 8(a)(3) in *General Motors* and *Beck*, we held that the section, fairly read, included the rights that we found. To the extent that these interpretations are not obvious, the relevant provisions of § 8(a)(3) have become terms of art; the words and phrasing of the subsection now encompass the rights that we announced in *General Motors* and *Beck*.

*Marquez,* 525 U.S. at 46. Thus, as the Eighth Circuit explained in *Bloom v. NLRB,* union security provisions requiring "membership in good standing" as a condition of employment incorporate the Court's "limiting gloss" from *General Motors* and *Beck*: They do *not* require employees to become union members. 209 F.3d 1060, 1063 (8th Cir. 2000).

Second, the Employee Plaintiffs' claims are insufficient to establish jurisdiction because none of the Public Entities' PLAs currently have union security clauses. That is, while Duluth and Cloquet previously had templates that included union security language, all the PLAs now specifically state "[n]othing in this Agreement requires employees to join a union or pay dues or fees to a union as a condition of working on the covered project." *See supra* at 2-6.

In short, because none of the PLAs has ever required anyone working on a covered project to join one of the signatory unions, the Employee Plaintiffs have failed even to allege, much less establish, the "invasion of . . . legally-protected interest[s] which are (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560.

They fare no better with respect to their claims regarding payment of fees under the prior form PLAs. In *Janus v. American Federation of State, County and Municipal*

11

*Employees, Council 31,* on which Plaintiffs rely (Compl. ¶ 38), the Supreme Court held that public employers and unions may not "extract agency fees from nonconsenting *employees.*" 138 S. Ct. 2448, 2485 (2018) (emphasis added).[4]  *See also Fleck v. Wetch,* 937 F.3d 1112, 1114 (8th Cir. 2019) ("*Janus* held that no fee or payment to the union 'may be deducted from a nonmember's wages . . . unless the employee affirmatively consents to pay . . . . before any money is taken.'").  To allege a "concrete and particularized" injury from operation of any of the Public Entities' PLAs, the Employee Plaintiffs would have to allege that they worked on a covered project and were compelled to pay fees without their consent.  Yet, none of the Employee Plaintiffs has identified any project on which any of the Public Entities used its PLA; any of the Employee Plaintiffs secured work; and either the Public Entity or any signatory union attempted either to compel the Employee to pay a fee or to have them removed from the job for their failure to do so.

Finally, with respect to their complaints about the referral system, Plaintiffs have failed to identify any projects on which any of the Public Entities used its PLA and on which any of the Employee Plaintiffs tried to find work but were diverted to the union's hiring halls.  Nor do they identify any projects on which any of the Public Entities is imminently planning to use its PLA and on which the Employee Plaintiffs plan to attempt to find work but will be required to use the hiring halls.

---

[4] Solely for purposes of this Motion, Defendants will assume, *arguendo,* but do not concede, that constitutional principles apply to private employees working under public sector PLAs.

12

The Employee Plaintiffs here stand in direct contrast to the plaintiffs in *Bierman v. Dayton*, individuals who were employed as home healthcare workers and represented by a union, who alleged they were harmed by the state's recognition of a union as *their* exclusive collective bargaining representative.  900 F.3d 570, 573 (8th Cir. 2018) (the alleged amplification of the union's voice and corresponding diminution of that of represented employees who disagree was sufficient "injury in fact" to satisfy Article III standing).  Instead, the Employee Plaintiffs are like the plaintiffs in *Sierra Club v. Robertson*, who challenged a forest management plan for timber sales as *per se* unlawful, but without pointing to its application to any past or impending timber sales.  28 F.3d at 259.  The Eighth Circuit found that "an environmental injury, based on the Plan alone, without reference to a particular site-specific action," rather than establishing injury that is "actual or certain to ensue," would "'take[] us into the area of speculation and conjecture.'"  *Id.* at 258 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)).

Like the plaintiffs in *Sierra Club,* the Employee Plaintiffs here refer to no "site-specific action."  Instead, they simply point to provisions in the PLAs to which they object and claim that the mere maintenance of these provisions "precludes [the Employees] from working on any public-works project subject to the PLA."  Compl. ¶ 23.  Yet, "[t]he Supreme Court has often emphasized that a lawsuit in federal court is not a forum for the airing of interested onlookers' concerns, nor an arena for public-policy debates."  *Mausolf*, 85 F.3d at 1301.  Having completely failed to establish Defendants either have caused them to suffer, or are imminently going to cause them to suffer, any "concrete and particularized" "invasion of . . . legally-protected interest[s]," *Lujan,* 504

13

U.S. at 560, the Employee Plaintiffs have failed to establish standing to pursue their constitutional claims.

### b.   *Christian Labor Association Lacks Standing.*

The CLA claims it has associational standing to seek relief against enforcement of the Public Entities' PLAs.  Compl. ¶ 27.  Fundamental to establishing associational standing is showing that the entity's members "would otherwise have standing to sue in their own right."  *Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977) (entity asserting associational standing must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit").  The CLA claims its members "would have standing to challenge the defendants' [PLAs] if they sued as individuals, because the PLAs prohibit the members of CLA from working on the defendants' public-works projects unless they renounce their membership and join a Council-affiliated union." Compl. ¶ 29.

As explained above, however, that claim simply is not correct.  Whether in their previous version or as amended, none of the Public Entities' PLAs has ever required employees to join the signatory unions or to "renounce their membership in the CLA." Instead, under the previous versions of the Duluth and Cloquet PLAs, the most the unions could have required of CLA members was payment of some amount of fees. *Marquez,* 525 U.S. at 46.  And even that requirement has been removed from the current form agreements.  Because none of the Public Entities' PLAs has ever required any employee

14

to "renounce their membership and join a Council-affiliated union" as a condition of working on a covered project, the CLA is not seeking to protect a right for which its members would otherwise have "standing to sue in their own right." *Hunt,* 432 U.S. at 343; *see also Vorchheimer v. Philadelphia Owners Ass'n,* 903 F.3d 100, 111 (3d Cir. 2018) (when exhibits attached to a complaint contradict the complaint's allegations, "the exhibits control"). The CLA has accordingly failed to establish that it has standing to pursue this litigation.

### c.    *Contractor Plaintiffs Lack Standing.*

To support their claims that Defendants are violating the antitrust laws,[5] the Contractor Plaintiffs allege that because their employees have "decline[d] membership in a Council-affiliated union," they are each "ineligible to work on any public-works project subject to the defendants' PLAs," unless the Contractor Plaintiffs recognize a Council-affiliated union as their employees' exclusive bargaining representatives while working on a covered project and hire their employees through the unions' referral systems. Compl. ¶ 32. And they allege the PLAs have prevented them from obtaining past work, but they are "able and ready" and likely to bid on Defendants' public works projects "in the reasonably foreseeable future." *Id.* ¶¶ 33, 34. These allegations are insufficiently concrete and particularized to support their claim for damages and are too conjectural and hypothetical to support their claim for declaratory or injunctive relief.

---

[5]  The Complaint contains no allegations that the PLA violates the Contractor Plaintiffs' constitutional rights. *See* Compl., Claim No. 1, ¶¶ 37-41 (detailing *employees'* constitutional rights).

The inadequacy of the Plaintiff Contractors' allegations is laid bare by comparing them to *Northeastern Florida Chapter, AGC v. City of Jacksonville,* 508 U.S. 656 (1993), in which the Supreme Court addressed similar claims that a government policy precluded construction contractors from bidding on public works contracts. Critical to the Court's conclusion that the contractor association had alleged sufficiently concrete harm was the allegation "that its members regularly bid on contracts in Jacksonville and that they would have bid on contracts set aside pursuant to the city's ordinance were they able to do so." *Id.* at 668.  The Court specifically distinguished its earlier decision in *Warth v. Seldin,* in which "the construction association . . . did not allege that 'any member ha[d] applied . . . for a building permit or a variance with respect to a current project.' Thus, unlike the association in *Warth,* [the *City of Jacksonville*] petitioner has alleged an 'injury . . . of sufficient immediacy . . . to warrant judicial intervention.'" *Id.* (quoting *Warth,* 422 U.S. at 516).

The Complaint in this case contains no allegations that any Contractor Plaintiffs perform work in Duluth, Cloquet or Two Harbors, or for the Sanitary District.  Instead, the Contractor Plaintiffs simply assert that that they are contractors with principal places of business in Duluth (Kaski, Compl. ¶ 4), Carlton, Minnesota (Roen Salvage Co., *id.* ¶ 5), and Sturgeon Bay, Wisconsin (Roen Salvage Co., *id.* ¶ 6).  The Complaint contains no allegations that Duluth, Cloquet, Two Harbors or the Sanitary District has used a PLA on any particular projects, much less projects on which any of the Contractor Plaintiffs bid or would have bid; no allegations that Duluth, Cloquet, Two Harbors or the Sanitary District is imminently planning to use a PLA on any project; or, even if any of the Public

16

Entities were imminently planning to do so, the covered project would be one on which any of the Contractor Plaintiffs would be qualified to bid. Instead, the Contractor Plaintiffs have done nothing more than allege that each of Public Entities maintains a policy to which the Contractors and their employees object. And as noted, a complaint that challenges a policy or plan, "devoid of any reference to the particularities of any proposed site-specific action" implementing that policy, fails to establish injury in fact. *Sierra Club v. Robertson,* 28 F.3d at 759.

*City of Jacksonville* illustrates another reason the Contractor Plaintiffs' allegations fail to establish standing: Plaintiffs have identified no conduct by Defendants that limits their ability to bid for work. The minority set-aside requirements the plaintiff association challenged in *City of Jacksonville* made a certain percentage of city contracts unavailable to the association's members. 508 U.S. at 659. The plaintiff was therefore challenging "a discriminatory policy that prevent[ed its members] from" bidding on contracts on the same basis as their competitors, and in so doing, was claiming an injury "fairly traceable" to the defendant city. *Id.* at 666. *See also, Gratz v. Bollinger,* 539 U.S. 224, 262 (2003) (white university applicant challenged university's affirmative action program for making a certain number of positions unavailable to him and other non-minority students); *Adarand Constructors v. Pena,* 515 U.S. 200 (1995) (subcontractor challenged race-based program for allocating contracts, which rendered him ineligible to compete for a portion of the state's contracts); *Quinn v. Millsap,* 491 U.S. 95 (1989) (non-property owners challenged property ownership requirement for membership on government board). In each of these cases, the plaintiff established "injury in fact," "fairly traceable"

17

to the defendants, by pointing to a barrier the defendant erected that denied the plaintiff the opportunity to be considered or to compete for a particular benefit, whether an official office, a place in a university or a public contract. *City of Jacksonville,* 508 U.S. at 667 (comparing *Warth*, in which "there was no claim that the construction association's members could not apply for variances and building permits on the same basis as other firms.")

The Contractor Plaintiffs here point to nothing in any of the PLAs that bars them from bidding for work or competing for any of the Public Entities' public works projects. To the contrary, each PLA clearly states that "any qualified bidder" can be awarded a contract on a covered project, "without reference to the existence or non-existence of any agreements between such bidder and any party to this Agreement; provided . . . that such bidder is willing, ready and able to become a party to and comply with this Project Agreement, should it be designated the successful bidder." *See, e.g.,* Compl. Ex. 1, Art. II § 5 (Duluth PLA). The Contractor Plaintiffs dislike these requirements. But they *could* secure their employees through the unions' referral systems; and their employees *could* work on the projects without sacrificing their right not to join the signatory unions. Instead, they choose not to. As the Supreme Court observed in *Boston Harbor*, when a public entity chooses to use a PLA on its construction project, "those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a [PLA.]" 507 U.S. at 231. Any alleged injury the Plaintiff Contractors have suffered by not obtaining work under any of

18

the Public Entities' PLAs is thus not "fairly traceable" to the PLA, *Lujan*, 504 U.S. at

560-61, but rather, is the result of their own choices.

The Contractor Plaintiffs' assertion that they are "able and ready" to apply for the

Public Entities' future projects is equally unavailing, as here, too, they have failed to

allege facts showing the requisite "'concrete' and 'imminent' injury upon which

[Supreme Court] standing precedents insist." *Carney v. Adams,* 141 S. Ct. 493, 501

(2020) (plaintiff must show a "concrete" intent to apply for the desired benefit "in the

reasonably imminent future.")  In *Carney,* the plaintiff – Adams – challenged a Delaware

constitutional requirement that judges on various courts be from the major political

parties. Adams, an independent, claimed the law disqualified him. Although he asserted

he "would apply for any judicial position that I thought I was qualified for," *id.* at 500,

the Court found Adams' "few words of general intent" insufficient to support "injury in

fact," *id.* at 502, 501, and that he failed to demonstrate the law "caused him a concrete,

particularized 'injury in fact' over and above the abstract generalized grievance suffered

by all citizens of Delaware," *id.* at 499.  As was the case with Adams, the Contractor

Plaintiffs' unadorned assertion that they are "likely" and "able and ready" to bid on "the

defendants' public works projects in the reasonably foreseeable future" (Compl. ¶ 33)

fails to allege "injury that is concrete, particularized, and imminent rather than

conjectural or hypothetical." *Carney*, 141 S.Ct. at 499 (internal citations and quotation

marks omitted).

The Contractor Plaintiffs have accordingly failed to establish Article III standing

to pursue their antitrust claims.

## 2. Plaintiffs' Claims that the PLAs Require "Membership" or Payment of Fees are Moot.

Alleging the PLAs require employees on covered projects to "join or financially support a union as a condition of employment," Plaintiffs seek a declaration that the PLAs unconstitutionally compel membership and an injunction against their enforcement. Compl. ¶¶ 38, 41. None of the Public Entities' PLAs currently contains any such requirements and all make explicit that "[n]othing in [their] Agreement requires employees to join a union or pay dues or fees to a union as a condition of working on the covered project." Even assuming any of these agreements could ever have been fairly read to compel membership, those claims, as well as any claims regarding compelled payments, are now moot.

The Eighth Circuit "will dismiss a case as moot when 'changed circumstances [have] already provide[d] the requested relief and eliminate[d] the need for court action.'" *Libertarian Party of Ark. v. Martin,* 876 F.3d 948, 951 (8th Cir. 2017) (quoting *Teague v. Cooper,* 720 F.3d 973, 976 (8th Cir. 2013)). While a defendant's voluntary cessation of a challenged practice may not, under certain circumstances, "'deprive a federal court of its power to determine the legality of a practice,' . . . 'statutory changes that discontinue a challenged practice are usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'" *Id.* (quoting *Teague,* 720 F.3d at 977); *see also Phelps-Roper v. City of Manchester,* 697 F.3d 678, 687 (8th Cir. 2012) (en banc). Exceptions to mootness "are rare and typically involve situations where it is virtually certain that the repealed law will be reenacted."

20

*Teague,* 720 F.3d 977 (internal quotations and citations omitted); *see also Prowse v. Payne*, 984 F.3d 700, 703 (8th Cir. 2021), *citing Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276 , 1283 (11th Cir. 2004) ("[w]hen government laws or policies have been challenged, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit.").

In this case, the City Councils of Duluth, Cloquet and Two Harbors – the governing entities with authority over public procurement – passed resolutions amending their form PLAs to make clear their agreements could not be construed to require anyone employed on a covered site to join or pay fees to a union as a condition of employment. Having done so, the City Councils have provided Plaintiffs with their "requested relief and eliminate[d] the need for court action." *Libertarian Party of Ark.,* 876 F.3d at 951.

There is no reason to believe any of the City Councils will reinsert union security requirements into their PLAs.  The Building Trades is the party to the PLAs whose affiliates would benefit if employees were required to join or financially support the unions.  Yet the Building Trades wrote to each of the Councils to express the Trades' support for amendments making clear that "union membership or support is not required for an employee of a non-signatory contractor to work on" a covered project.  Olson Decl. ¶ 6.  Moreover, each of the City Councils voted unanimously to adopt the resolutions amending the PLAs.  Helmer Decl. ¶ 4; Peterson Decl. ¶ 4; Walker Decl. ¶ 4. *See Libertarian Party of Ark.,* 876 F.3d at 951 (no indication General Assembly intends to reenact the challenged requirement, where the House unanimously amended the challenged law.). Because it is *not* "virtually certain" that the Public Entities would

21

reverse the changes in the PLAs to reinsert union-security provisions, *Teague*, 720 F.3d at 977, the voluntary-cessation exception to mootness does not apply.

Finally, this is not a situation in which the challenged action is "capable of repetition yet evad[ing] review." *McCarthy v. Ozark Sch. Dist.,* 359 F.3d 1029, 1035 (8th Cir. 2004) (actions seeking declaratory or injunctive relief for a repealed version of a law are moot unless the problems are "capable of repetition yet evad[ing] review.")  In *Phelps-Roper,* the Court found the plaintiffs "capable of challenging any further change" to the contested ordinance because they had filed a least seven other lawsuits challenging similar laws.  697 F.3d at 687.  Likewise here, counsel for Plaintiffs have filed nearly identical complaints in at least four other cases.[6]  In the unlikely event any of the Cities were to reenact provisions they recently excised from their PLAs, there is little question that Plaintiffs, or others standing in their shoes, would be able and ready to challenge those actions.

In sum, Plaintiffs' claims based on contractual requirements that employees join or financially support the unions are moot because the allegedly "unconstitutional burden" Plaintiffs claim here is "neither capable of repetition yet evading review, nor one that can be reasonably expected to recur after the defendant[s] voluntarily ceased imposing it." *Moore v. Thurston,* 928 F.3d 753, 757 (8th Cir. 2019).

---

[6]  *See Ass'd Builders & Contractors of Western Pa. v. Plum Borough,* Docket No. 2:20-cv-01933 (W.D. Pa.); *Ass'd Builders & Contractors of Western Pa. v. Community College of Allegheny Co.,* Docket No. 2:20-cv-649 (W.D. Pa.); *Ass'd Builders & Contractors of Western Pa. v. County of Westmoreland,* Docket No. 2:19-cv-1213 (W.D. Pa.); *Road-Con v. City of Philadelphia,* Docket No. 2:19-cv-1667 (E.D. Pa.).

Judges in this district have recently dismissed requests for injunctive and declaratory relief as moot after *Janus* when defendants "ceased deducting" fees from nonconsenting employees' paychecks and "averred that [p]laintiffs will not be required to pay union fees unless they voluntarily rejoin their unions." *Hoekman v. Educ. Minn.*, No. 18-cv-01686, 2021 WL 533683, at *10 (D. Minn. Feb. 12, 2021) (Nelson, J.); *see also Loescher v. Minn. Teamsters Pub. & L. Enf't Employees' Union, Loc. No. 320*, 441 F. Supp. 3d 762, 771–72 (D. Minn. 2020) (Wright, J.) (dismissing damages claims in union-dues case as moot because the union "already provided" what plaintiff requested and plaintiff did not otherwise "allege any injury for this Court to redress"). Because there is similarly nothing left to enjoin or declare unlawful in this case, this Court should dismiss Plaintiffs' constitutional claims as moot.

**B.   The Complaint Must be Dismissed under Rule 12(b)(6) for Failure to State any Claims for Which Relief can be Granted.**

**1.   *Plaintiffs have Failed to State a Claim for Violation of the Employees' First and Fourteenth Amendment Rights.***

Plaintiffs claim that the PLAs violate the Plaintiff Employees' constitutional rights not to "join or associate with a union." Compl. ¶¶ 37–41. Insofar as this claim rests on Plaintiffs' contention that the PLAs require employees working on a covered project to join a union, that claim misconstrues the documents Plaintiffs attached to their Complaint (*see supra* at 10-11), and insofar as it rests on their claim some of the PLAs require employees to pay union dues, that claim is moot (*see supra* at 20-23). To the extent the Employee Plaintiffs are instead complaining that the PLAs require them to secure work through the unions' referral systems and recognize the unions as their exclusive collective

23

bargaining representatives while working on a covered project (Compl. ¶¶ 32, 35), those claims are foreclosed by well-established legal principles.

The signatory unions operate their referral systems on covered projects by virtue of their status as the employees' exclusive bargaining representative and under authority granted by the PLAs.  *See e.g.,* Compl. Ex 1 (Duluth PLA), Art. III § 1, Art. IV; *Breininger v. Sheet Metal Workers Local 6*, 493 U.S. 67, 87-88 (1987) (a union refers workers for employment through a hiring hall because of its status as the "bargaining representative and by virtue of the power granted to it by the collective-bargaining agreement"); *see also* 29 U.S.C. § 8(f) (explicitly authorizing agreements in the construction industry that "require[] the employer to notify [the union] of opportunities for employment . . . or give[ the union] an opportunity to refer qualified applicants for such employment . . . .").  In *Minnesota State Bd. for Community Colleges v. Knight,* 465 U.S. 271 (1984), the plaintiffs, a group of home healthcare workers, similarly argued that the state's recognition of a union as their exclusive bargaining representative violated their constitutionally protected association rights.  As the Eighth Circuit explained, the Supreme Court in *Knight* "summarily affirmed the constitutionality of exclusive representation for subjects of mandatory bargaining" and "ruled that the exclusive representation did not impinge on the right of association."  *Bierman*, 900 F.3d at 575, *citing Knight,* 465 U.S. at 279, 288-89.  The Supreme Court recently reaffirmed this principle in *Janus*, writing that although the First Amendment precludes public employers from compelling their employees to pay agency fees, a state may otherwise

24

"keep their labor-relations systems exactly as they are," *including* "by requir[ing] that a union serve as exclusive bargaining agent for its employees."  138 S. Ct. at 2485 n.27.

Accordingly, the Employee Plaintiffs have failed to state a claim that the PLAs violate any of their rights under the First or Fourteenth Amendments, and Claim No. 1 must be dismissed.

2.     ***Plaintiffs Have Failed to State a Claim for Violation of the Antitrust Laws.***

Plaintiffs claim the PLAs violate the Sherman Act, which prohibits contracts in restraint of trade and monopolization of commerce.  15 U.S.C. §§ 1, 2.  But the antitrust claim is fatally defective in several respects.  First, the Complaint – which merely alleges that the PLAs include terms that Plaintiffs consider onerous or undesirable and does not allege a restriction on competition in any identifiable market – does not state a violation of the Sherman Act.  Second, even if Plaintiffs had Article III standing (which they do not), they do not allege the type of injury required to confer antitrust standing.  And third, the PLAs are exempt from antitrust scrutiny under the nonstatutory labor exemption applicable to lawful collective bargaining agreements that are consistent with federal labor policy.

a.     ***The Complaint does not State a Violation of the Sherman Act.***

The allegations on which Plaintiffs base their antitrust claim are remarkably brief. The Complaint alleges the Defendants violated the Sherman Act by entering into the PLAs because they exclude contractors and individual laborers unwilling to agree to the PLAs' provisions on union recognition, job-referral, and union security.  Compl. ¶¶ 45-

46. That does not state a violation of the Sherman Act for two reasons: (1) It does not allege an injury to competition, as opposed to an injury to individual competitors and noncompetitors; and (2) it does not identify the relevant market within which competition was allegedly affected.

The claim that Plaintiffs were excluded because they were unwilling to agree to Defendants' terms does not state a violation of the Sherman Act. The Supreme Court and the Eighth Circuit have frequently emphasized that "[t]he antitrust laws exist for 'the protection of *competition* not *competitors.*" *Razorback Ready Mix Concrete Co. v. Weaver,* 761 F.2d 484, 488 (8th Cir. 1985) (emphasis in original) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 488 (1977)). A private party alleging a violation of the antitrust laws must "plead . . . injury to competition." *Razorback Ready Mix*, 761 F.2d at 488; *see Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996) ("Over and over, we stress that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business."). In *Razorback Ready Mix*, for example, the Eighth Circuit held that the district court should have dismissed the antitrust claim because "Razorback failed to allege . . . any adverse effect on competition." 761 F.2d at 488.

Plaintiffs do not allege any adverse effect on competition. Their complaint is that they view the terms of the PLAs as unfair and that the effect of those terms is to disqualify those who find them objectionable. But the "unfairness" of those terms does not constitute a Sherman Act violation. As the Supreme Court has stated, "the federal

26

antitrust laws . . . do not create a federal law of unfair competition." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225 (1993). Congress did not enact those laws to protect the "welfare of a particular competitor who may be hurt as the result of some trade practice." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). Plaintiffs may object to the terms of the PLAs, but their unwillingness to meet those terms does not state a violation of federal antitrust laws.

Nor does the allegation that the effect of those terms is to disqualify those unwilling to work under them somehow convert Plaintiffs' complaint about their unfairness into a Sherman Act violation. A competitor does not state a violation of the antitrust laws merely by alleging that it has been unfairly denied work or excluded as a competitor by a party's insistence on onerous terms. *Double D Spotting Serv. v. Supervalu, Inc.,* 136 F.3d 554, 561 (8th Cir. 1998) ("Disappointment at not receiving one unloading contract at one particular warehouse is insufficient as a matter of law to rise to the level of an antitrust violation within a relevant market."). *Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 344 (8th Cir. 1995) ("Inflicting painful losses on competitors 'is of no moment to the antitrust laws if competition is not injured.'") (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962)). That Plaintiffs were unwilling to work under the terms of the PLAs does not in any way show that Defendants violated federal antitrust laws by entering into those agreements. Again, as the Supreme Court observed in *Boston Harbor,* contractors that do not usually enter PLAs have a choice—alter their usual practices to secure the business or seek business elsewhere. 507 U.S. at 231.

Even if they had alleged the requisite effect on competition, Plaintiffs' antitrust

claim would still fail, because the Complaint does not describe the relevant market within which competition was allegedly affected.  To avoid dismissal, a plaintiff alleging violations of either Section 1 or Section 2 of the Sherman Act must allege a valid, relevant market within which competition was restrained or commerce monopolized. *Double D Spotting,* 136 F.3d at 560 ("[T]o state a Sherman Act claim under either section 1 or section 2, the plaintiff must identify a valid relevant market."); *accord, Little Rock Cardiology Clinic Pa. v. Baptist Health,* 591 F.3d 591, 596 (8th Cir. 2009) (at the pleading stage, the plaintiff "has the burden of alleging a relevant market in order to state a plausible antitrust claim"); *Razorback Ready Mix,* 761 F.2d at 488.  As the Eighth Circuit has explained, the market allegation is critical, because "[w]ithout a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition."  *Little Rock Cardiology,* 591 F.3d at 596.  Because the Complaint does not even attempt to allege a valid relevant market, the antitrust claim must be dismissed.[7]

### b.   *Plaintiffs do not Have Antitrust Standing.*

Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore . . . and shall recover threefold the damages by him sustained."  15 U.S.C. § 15(a).  But as the Supreme Court stated in *Associated General Contractors of California,*

---

[7]  Plaintiffs may try to avoid dismissal by arguing that they might attempt to characterize the PLAs as *per se* violations, which do not require an alleged market.  *Double D Spotting, supra.*  But the Complaint does not allege a *per se* violation, and as the Supreme Court observed in *Associated Gen. Contractors of Cal. v. Carpenters,* 459 U.S. 519, 526 (1983), "[i]t is not . . . proper to assume that . . . the defendants have violated the antitrust laws in ways that have not been alleged."

"Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages." 459 U.S. at 535, quoting *Blue Shield of Va. v. McCready,* 457 U.S. 465, 476-77 (1982).

To establish standing and avoid dismissal, a private antitrust plaintiff must allege that it has suffered an "antitrust injury." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.,* 797 F.3d 538, 542 (8th Cir. 2015); *see NicSand, Inc. v. 3M Co.,* 507 F.3d 442, 450 (6th Cir. 2007) ("antitrust standing is a threshold, pleading-stage inquiry") (cited in *Insulate SB,* 797 F.3d at 542). An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent . . . that flows from that which makes the defendants' acts unlawful." *Brunswick Corp.,* 429 U.S. at 489; *Peterson v. Gen. Motors Corp.,* 975 F.2d 518, 520 (8th Cir. 1992). Accordingly, in each case, a plaintiff's "alleged injury must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall." *Associated Gen. Contractors of Cal.,* 459 U.S. at 540.[8]

### 1)   Individual Employee Plaintiffs Lack Antitrust Standing.

Each of the Employee Plaintiffs avers he is employed by one of the Contractor Plaintiffs. Compl. ¶¶ 7, 9. The Complaint alleges that each of these individuals was injured by the PLAs' requirement that contractors working on covered projects comply with the PLA's union security and job referral provisions. Compl. ¶ 35.

---

[8] In *Associated General Contractors of California,* the Supreme Court explained that "antitrust standing" is "somewhat different" from Article III standing. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." 459 U.S. at 536 n.31.

Antitrust standing "is generally limited to actual market participants, that is, competitors or consumers." *S.D. Collectibles, Inc. v. Plough, Inc.,* 952 F.2d 211, 213 (8th Cir. 1991). The individual Employee Plaintiffs in this case are neither. "A mere causal connection" between the alleged antitrust violation and the alleged harm is insufficient. *Peterson,* 975 F.2d at 520. Thus, as the Eighth Circuit has observed, derivative injuries suffered by employees whose employer may have suffered an antitrust injury does not confer antitrust standing on those employees, and courts "routinely" dismiss claims based on such injuries. *Id.* at 521. In this case, the fact that the Employee Plaintiffs are employed by contractors that would be required to comply with the PLAs, were they to perform work covered by those agreements, is not sufficient to confer standing on those employees.

Moreover, their claim that the PLAs would require compliance with the union security and job referral provisions is insufficient as a matter of law. The harm suffered by an antitrust plaintiff must be "a loss that Congress intended to prevent with the antitrust laws." *Id.* at 520. Congress did not enact the antitrust laws to protect employees from union security or job referral provisions. NLRA Section 8(f) explicitly makes lawful both union security and job referral provisions, like those in the PLAs, in the construction industry. *See* 29 U.S.C. §§ 158(f)(2), (3). Although the point seems obvious, Congress did not enact the antitrust laws to protect employees from the type of contractual provisions that Congress, in Section 8(f) of the NLRA, explicitly made lawful. The Employee Plaintiffs therefore lack antitrust standing.

30

### 2)   CLA Lacks Antitrust Standing.

The CLA claims that it has "associational standing," which it acknowledges requires it to show that its members would otherwise have standing to sue in their own right. Compl. ¶¶ 27, 28. The Complaint alleges CLA members would have standing because the PLAs require them to comply with the PLAs' union security provisions. Compl. ¶ 29. As explained, mandatory compliance with a union security clause does not confer antitrust standing. Thus, setting aside the fact that any claims based on union security provisions are moot, the CLA lacks associational standing because CLA's members lack antitrust standing.

The Complaint also alleges that the CLA "seeks to maximize work opportunities for its members and the contractors that employ them." Compl. ¶ 30. In *Associated General Contractors of California,* the Supreme Court observed that "the [plaintiff] union was neither a consumer nor competitor in the market in which trade was [allegedly] restrained" and consequently, "a union, in its capacity as bargaining representative, will frequently not be a part of the class the Sherman Act was designed to protect." 459 U.S. at 539-40. In that case, the Court held that the union plaintiff did not have antitrust standing because "the Union's labor-market interests seem to predominate." *Id.* at 540.

The same can be said for the CLA in this case. The CLA is neither a consumer nor competitor in the market for construction work. And its alleged interest in maximizing work opportunities for CLA members reflects a concern about the labor market and not an interest in competition among construction contractors. Because the CLA is not among those that the antitrust laws were enacted to protect, the CLA lacks

31

antitrust standing. [9]

### 3) Contractor Plaintiffs Lack Antitrust Standing.

The Complaint alleges that the Contractor Plaintiffs have standing because they would be ineligible to work under the PLAs unless they complied with the PLAs' terms, including those on union recognition and job referral.  Compl. ¶ 32.

As explained above, *supra* at 26, the Contractors' complaint is that they view the PLAs' terms as unfair.  They do not allege that competition in an identifiable market has been restrained to the detriment of consumers or providers of construction services.  If the Complaint does not allege an antitrust injury (and it does not), then Plaintiffs have not alleged that anyone, including the Contractor Plaintiffs named in the Complaint, has antitrust standing.

In *Ehredt Underground, Inc.,* the plaintiff alleged that a union and a consumer of construction services violated the Sherman Act, *inter alia,* by insisting that any contractors employ union members, and by assigning jurisdiction over that work to a local union with a higher wage scale, which caused the plaintiff contractor economic harm.  But that harm, which did not arise from any restriction on competition, did not satisfy the requirement of antitrust standing.  As the court observed, "[I]t is hard to see how [plaintiff] suffered antitrust injury."  90 F.3d at 240.

As *Ehredt* and other cases show, *see supra* at 26-28, the loss of business or

---

[9]  In *Associated General Contractors*, the Court also relied on "the tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury," *id.* at 545, a description that also applies to any damages purportedly suffered by the CLA itself.

customers does not in and of itself confer antitrust standing. The injury must arise from a restriction on competition. Because any economic loss allegedly suffered by the Contractor Plaintiffs arose from their objections to working under the terms of the PLAs and not from any limitations or restrictions Defendants placed on competition, the Contractor Plaintiffs lack antitrust standing.

      c.      **The PLAs are Shielded from Antitrust Scrutiny by the Nonstatutory Labor Exemption.**

In enacting the NLRA, Congress declared that "the policy of the United States [is] to eliminate the causes of certain substantial obstructions to the free flow of commerce . . . by encouraging the practice and procedure of collective bargaining." 29 U.S.C. § 151. That law thus reflected what the Supreme Court has described as "the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions." *Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 622 (1975). The Court also recognized that although eliminating competition over wages would "affect price competition among employers, . . . the goals of federal labor laws never could be achieved if this effect on business competition were held a violation of the antitrust laws." *Id.*

To prevent litigants and courts from frustrating the strong federal policy of promoting collective bargaining and eliminating wage competition, the Supreme Court "implied" the "nonstatutory" labor exemption. *Brown v. Pro Football Inc.,* 518 U.S. 231, 235-36 (1996). That exemption "limit[s] an antitrust court's authority to determine, in the area of industrial conflict, what is or is not a 'reasonable' practice." *Id.* at 236-37.

33

In determining whether the nonstatutory exemption applies, the fundamental question is whether the conduct challenged "grew out of, and was directly related to, the lawful operation of the bargaining process." *Id.* at 250.[10]  In *Meat Cutters Local 576 v. Wetterau Foods, Inc.,* 597 F.2d 133 (8th Cir. 1979), for example, a union challenged an agreement in which one company agreed to provide strike replacements to another company after the union called an economic strike.  The union characterized that agreement as a combination in restraint of trade.  The Eighth Circuit, however, concluded that the nonstatutory exemption shielded the employer's conduct because any injury to the union "would flow naturally from the replacement of striking workers, which conduct federal labor policy sanctions." *Id.* at 136.

There can be little question that the PLAs at issue in this case resulted from "the lawful operation of the bargaining process."  As the *Ehredt Underground* court explained, "A buyer of construction services may insist that its contractors have labor agreements with an identified union, to reduce the potential for labor unrest.  Indeed, the project's owner or general contractor may insist that the subcontractors accede to a particular collective bargaining agreement that provides for wages higher than the subcontractor otherwise would pay." 90 F.3d at 240.

In support of that statement, the *Ehredt* court cited the Supreme Court's decision in *Boston Harbor.*  In that case, the Massachusetts Water Resources Authority required

---

[10] The *Brown Court* also relied on the facts that the challenged employer conduct "involved a matter that the parties were required to negotiate collectively" and "concerned only the parties to the collective bargaining relationship." *Id.*

all bidders on a project to adopt a PLA that included mandatory provisions on union

recognition, job referral, and union security.  507 U.S. at 221-22.  The *Boston Harbor*

plaintiffs argued that the NLRA preempted enforcement of that requirement, but the

Court disagreed.

In reaching that conclusion, the Court observed that the project labor agreements –

"[p]rehire agreements . . . providing for union recognition, compulsory union dues or

equivalents, and mandatory use of union hiring halls," *id.* at 230 – "promote[d] the

legislative goals that animated the passage of" those parts of the NLRA applicable to the

construction industry.  *Id.*  And the Court specifically stated that, since the defining

characteristics of the construction industry do not depend on the private or public nature

of the entity purchasing contracting services, a public entity, acting as purchaser, should

have the same option "to participate freely in the marketplace" by entering into such

agreements.  *Id.* at 230-31.

*Boston Harbor* teaches that PLAs mandated by public entities effectuate the

policies underlying the NLRA.  *See Ehredt,* 90 F.3d at 241 ("*Boston Harbor* shows that

the labor laws permit an owner to insist that multiple contractors adhere to a single

representational system and wage rate for a construction project."); *see also Johnson v.*

*Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011 (9th Cir. 2010) (public college PLA

consistent with federal labor policy); *Bldg. Indus. Elec. Contractors Ass'n v. City of New*

*York,* 678 F.3d 184 (2nd Cir. 2012) (city PLA consistent with federal labor policy).

As lawful agreements resulting from a lawful bargaining process, such agreements

35

are shielded from antitrust scrutiny by the nonstatutory exemption.[11]   That conclusion is

confirmed by decisions of other courts applying the nonstatutory exemption to similar

PLAs.  *Associated Builders v. City of Seward,* 966 F.2d 492, 498-99 (9th Cir. 1992);

*Ehredt,* 90 F.3d at 240-41.  Because the PLAs in this case are shielded from antitrust

scrutiny by the nonstatutory exemption, the antitrust claim must be dismissed.

---

[11]  In *Connell Construction,* the Court refused to apply the nonstatutory exemption to a
subcontracting agreement that the Court concluded violated NLRA Section 8(e).  421
U.S. at 625-26.  *Compare Brown, supra,* stating that the exemption applies to conduct
"unobjectionable as a matter of labor law and policy."  518 U.S. at 238.  Accordingly, the
critical distinction between this case and *Connell* is that the agreement challenged in
*Connell* was deemed inconsistent with federal labor policy and the agreements
challenged here, as *Boston Harbor* shows, are consistent with that policy.

## CONCLUSION

The Complaint should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state any claims upon which relief may be granted.

Respectfully submitted,

REBECCA ST. GEORGE, CITY
ATTORNEY, and
 *s/ Elizabeth A. Sellers*
Elizabeth A. Sellers (0395652)
Assistant City Attorney
411 West First Street, Rm. 440
Duluth, MN  55802
(218) 730-5281
esellers@duluthmn.gov

*Attorneys for Defendant City of Duluth*

GREENE ESPEL PLLP
 *s/Monte A. Mills*
Monte A. Mills (030458X)
Davida S. McGhee (0400175)
222 S. Ninth Street, Suite 220
Minneapolis MN 55402
(612) 373-0830
mmills@greeneespel.com
dwilliams@greeneespel.com

*Attorneys for Defendants City of
Cloquet, City of Two Harbors,
Western Lake Superior Sanitary District*

ANDREW, BRANSKY AND POOLE,
P.A.
 *s/ Timothy W. Andrew*
Timothy W. Andrew (227250)
302 West Superior Street, Suite 300
Duluth MN, 55802
(218) 722-1764
timandrew@duluthlawfirm.com

SHERMAN DUNN, P.C.
 *s/ Victoria L. Bor*
Victoria L. Bor  (D.C. #288852)
Jonathan D. Newman (D.C. #449141)
Robert D. Kurnick (D.C. #243683)
900 Seventh Street, N.W.  Suite 1000
Washington, D.C.  20001
(202)785-9300
bor@shermandunn.com
newman@shermandunn.com
kurnick@shermandunn.com

*Attorneys for Defendant Duluth Building
& Construction Trades Council*