# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Christian Labor Association; Kaski Inc.; Nordic Group Inc.; Roen Salvage Co.; Luke Krhin; Dylan Smith,<br><br>        Plaintiffs,<br><br>v.<br><br>City of Duluth; City of Cloquet; City of Two Harbors; Western Lake Superior Sanitary District; Duluth Building and Construction Trades Council,<br><br>        Defendants. | Case No. 0:21-cv-00227-DWF-LIB |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(1) AND 12(b)(6)

WALTER S. ZIMOLONG*
Pennsylvania Bar No. 89151
Zimolong LLC
P.O. Box 552
Villanova, PA 19085
(215) 665-0842 (phone)
wally@zimolonglaw.com

THOMAS R. REVNEW
Minnesota Bar No. 0295620
Peters, Revnew, Kappenman
& Anderson, P.A.
7300 Metro Boulevard, Suite 500
Minneapolis, Minnesota 55439
(952) 921-4622 (phone)
(952) 896-1704 (fax)
trevnew@prkalaw.com

JONATHAN F. MITCHELL*
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

* admitted *pro hac vice*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of contents ............................................................................................... i

Table of authorities .......................................................................................... ii

   I.  The plaintiffs have alleged Article III standing ....................................... 1

      A.  The employee plaintiffs have alleged Article III standing to seek both damages and retrospective relief ....................................................... 1

      B.  The Christian Labor Association has alleged Article III standing to seek both damages and retrospective relief ............................................... 5

      C.  The contractor plaintiffs have alleged Article III standing to seek both damages and retrospective relief ....................................................... 5

  II.  The defendants' post-filing amendments to the PLAs do not moot the plaintiffs' claims for prospective relief ................................................. 9

 III. Only one plaintiff in each case needs Article III standing to seek prospective relief ............................................................................................... 15

 IV. The plaintiffs have alleged violations of the First and Fourteenth Amendments ...... 15

  V.  The plaintiffs have alleged an antitrust claim ........................................ 17

      A.  The plaintiffs have alleged a violation of the antitrust laws ............................. 17

      B.  The plaintiffs have alleged antitrust standing ................................................... 21

      C.  The non-statutory labor exemption is inapplicable to the plaintiffs' antitrust claims ........................................................................... 23

Conclusion ....................................................................................................... 30

Certificate of compliance ............................................................................... 31

Certificate of service ...................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Likins,*
   517 F.2d 532 (8th Cir. 1975) ...................................................................... 10

*American Legion v. American Humanist Ass'n,*
   139 S. Ct. 2067 (2019) .............................................................................. 1

*Arizona v. Maricopa County Medical Society,*
   457 U.S. 332 (1982) ................................................................................ 20

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................................. 7

*Associated Builders & Contractors, Inc. v. City of Seward,*
   966 F.2d 492 (9th Cir. 1992) ............................................................. 27, 28

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................ 18

*Brown v. Pro Football, Inc.,*
   518 U.S. 231 (1996) ......................................................................... passim

*Building and Construction Trades Council of the Metropolitan District v.*
   *Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.,*
   507 U.S. 218 (1993) ................................................................................ 28

*Carney v. Adams,*
   141 S. Ct. 493 (2020) ........................................................................ 2, 6, 8

*City of Mesquite v. Aladdin's Castle, Inc.,*
   455 U.S. 283 (1982) .................................................................................. 9

*Connell Construction Co. v. Plumbers & Steamfitters, Local 100,*
   421 U.S. 616 (1976) ................................................................................ 27

*Connell Construction Co. v. Plumbers & Steamfitters, Local 100,*
   421 U.S. 616 (1976) ....................................................... 23, 24, 25, 26

*Czyzewski v. Jevic Holding Corp.,*
   137 S. Ct. 973 (2017) ................................................................................ 2

*Davis v. Federal Election Comm'n,*
   554 U.S. 724 (2008) .................................................................................. 3

*Direct Marketing Ass'n v. Brohl,*
   135 S. Ct. 1124 (2015) ............................................................................ 26

*Ehredt Underground, Inc. v. Commonwealth Edison Co.,*
   90 F.3d 238 (7th Cir. 1996) ............................................................... 28, 29

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) ....................................................................... 3, 10, 12

*Gratz v. Bollinger,*
539 U.S. 244 (2003) ............................................................................6

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31,*
138 S. Ct. 2448 (2018) ...................................................................2, 16

*Libertarian Party of Arkansas v. Martin,*
876 F.3d 948 (8th Cir. 2017) ........................................................11, 13

*Lifewatch Servs. Inc. v. Highmark Inc.,*
902 F.3d 323 (3d Cir. 2018) ..............................................................19

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
140 S. Ct. 2367 (2020) .......................................................................15

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ..........................................................................1, 9

*Manhattan Community Access Corp. v. Halleck,*
139 S. Ct. 1921 (2019) .....................................................................3, 9

*Massachusetts v. EPA,*
549 U.S. 497 (2007) .............................................................................4

*Minnesota State Board for Community Colleges v. Knight,*
465 U.S. 271 (1984) ...........................................................................16

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) .............................................................................4

*Northeast Florida Chapter of Associated General Contractors of America v.
City of Jacksonville,* 508 U.S. 656 (1993) ...........................................6

*Parents Involved in Community Schools v. Seattle School District No. 1,*
551 U.S. 701 (2007) .....................................................................12, 13

*S.D. Collectibles, Inc. v. Plough, Inc.,*
952 F.2d 211 (8th Cir. 1991) .............................................................21

*Sanjuan v. American Board of Psychiatry & Neurology, Inc.,*
40 F.3d 247 (7th Cir. 1994) ...............................................................18

*Sierra Club v. Robertson,*
28 F.3d 753 (8th Cir. 1994) .............................................................4, 5

*Texaco Inc. v. Dagher,*
547 U.S. 1 (2006) ...............................................................................20

*Thompson v. Real Estate Mortgage Network,*
748 F.3d 142 (3d Cir. 2014) ..............................................................17

*Town of Chester v. Laroe Estates, Inc.,*
137 S. Ct. 1645 (2017) .......................................................................15

*Troiano v. Supervisor of Elections in Palm Beach County*,
  382 F.3d 1276 (11th Cir. 2004)................................................................12

*United States v. Students Challenging Regulatory Agency Procedures*
  *(SCRAP)*, 412 U.S. 669 (1973) ..............................................................1

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021)..............................................................................5

*Waters v. Churchill*,
  511 U.S. 661 (1994) ..............................................................................26

*Webster v. Fall*,
  266 U.S. 507 (1925) ..............................................................................26

**Statutes**

15 U.S.C. § 17 .........................................................................................24

29 U.S.C. § 52 .........................................................................................24

29 U.S.C. § 104 .......................................................................................24

29 U.S.C. § 105 .......................................................................................24

29 U.S.C. § 113 .......................................................................................24

29 U.S.C. § 152(2)..............................................................................28, 29

29 U.S.C. § 158(f)..........................................................................21, 22, 28

The defendants seek dismissal on numerous grounds, and we will address each of their arguments in turn.

## I. The Plaintiffs Have Alleged Article III Standing

A plaintiff needs only to allege and not prove Article III standing at the motion-to-dismiss stage. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). And each group of plaintiffs has alleged that the defendants' enforcement of the project labor agreement is inflicting Article III injury.

### A. The Employee Plaintiffs Have Alleged Article III Standing To Seek Both Damages And Retrospective Relief

The employee plaintiffs have specifically alleged that they are unable to work on the defendants' public-works projects unless they: (1) join a Council-affiliated union; and (2) seek employment through the Council-affiliated unions' job-referral systems. *See* Complaint (ECF No. 1) at ¶ 35. That inflicts injury in fact. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)). The inconvenience of having to go through a union hiring hall, and the compelled association with a union that the employee plaintiffs want no part of, is more than enough to establish Article III injury. *See American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067 (2019) (unwanted contact with a religious display sufficient to confer standing).

The defendants try to defeat standing by denying that their project labor agreements required actual "membership" in a Council-affiliated union. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 9–10. Instead, the defendants insist that the PLA "membership" requirement meant only that an employee must

*pay money* to a Council-affiliated union in an amount equal to the union's initiation fees and dues. *See id.* at 10. Even if that is true, it does nothing to defeat the employee plaintiffs' *standing* to sue, as the employee plaintiffs were still injured by the compulsory union payments that the PLAs admittedly required as a condition of working on the defendants' public-works projects. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *see also Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2486 (2018) (conditioning public employment on mere payments to a union not only inflicts Article III injury but also violates a public employee's constitutional rights). And the employee plaintiffs remain injured by the PLAs' requirement that they obtain employment through a union hiring hall. It is undisputed that the PLAs were injuring the employee plaintiffs at least to *that* extent when the lawsuit was filed. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 9–11.

The defendants also claim that the employee plaintiffs lack "standing" because the defendants have amended their PLAs in response to this lawsuit, and they insist that these amendments remove any requirement to join or pay a union as a condition of working on their public-works projects. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 11. That argument has nothing to do with the plaintiffs' *standing*, which is determined at the moment a complaint is filed and is unaffected by post-filing events. *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020) ("[S]tanding is assessed at the time the action commences" (citation and internal quotation marks omitted)); *Davis v. Federal Election Comm'n*, 554

U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."). The implications of the defendants' amendments to their PLAs pertain to *mootness* and not standing, and those implications will be considered in Part II, *infra*. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (warning courts not to "confuse[] mootness with standing"). For now, it is enough to say that the plaintiffs had *standing* to challenge the enforcement of the PLAs when the complaint was filed, and the defendants' post-filing amendments to their PLAs do nothing to change that fact.

The employee plaintiffs are *not* required to allege that "they worked on a covered project and were compelled to pay fees without their consent," as the defendants insist. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 12. Nor are the employee plaintiffs required to "identify" projects on which they "tried to find work but were diverted to the union's hiring halls." *Id.* The allegations of the complaint—which must be assumed true at this stage of the litigation[1]—establish that the PLAs have deterred the plaintiffs from seeking work on *any* of the defendants' public-works projects because they are unwilling to pay money to a Council-affiliated union or seek work through those unions' job-referral

---

1. *See Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1927 (2019) ("Because this case comes to us on a motion to dismiss, we accept the allegations in the complaint as true.").

systems. That is all that is needed to allege that the employee plaintiffs have lost and are losing work opportunities on account of the PLAs.[2]

The defendants claim that *Sierra Club v. Robertson*, 28 F.3d 753 (8th Cir. 1994), requires an allegation of "site-specific action," but it requires nothing of the sort. *Sierra Club* held that environmentalists lacked standing to challenge a land and resource management plan for national forests because the mere *adoption* of that plan did nothing to *affect* the environment or inflict environmental injury. The Court explained:

> Adoption of the Plan does not effectuate any on-the-ground environmental changes. Nor does it dictate that any particular site-specific action causing environmental injury must occur. Indeed, before an environmental change can come about, several events must transpire. First, a site-specific action (*e.g.,* a timber sale) must be proposed and found to be consistent with the Plan. Next, the action is subject to NEPA and NFMA analysis and public comment. Finally, the Forest Service must adopt the action. Finding an environmental injury based on the Plan alone, without reference to a particular site-specific action, would "take[ ] us into the area of speculation and conjecture." *O'Shea v. Littleton,* 414 U.S. 488, 497 (1974).

---

2.  The PLAs also injure the employee plaintiffs by imposing a *risk* that they would be forced to go through the union hiring halls, so long as an injunction from this Court that blocks the continued enforcement of the project labor agreements would reduce that risk. *See Massachusetts v. EPA*, 549 U.S. 497, 525 n.23 (2007) ("[E]ven a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability") (quoting *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993)); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010) (conventional alfalfa farmers had standing to seek injunctive relief because the agency's decision to deregulate a variety of genetically engineered alfalfa gave rise to a "significant risk of gene flow to non-genetically-engineered varieties of alfalfa.").

*Id.* at 758. In this case, by contrast, the PLAs have immediate effects on the employee plaintiffs and their job opportunities, by categorically precluding them from working on the defendants' public-works projects unless they join (or at the very least pay) a Council-affiliated union and seek work through those unions' job-referral systems.

### B. The Christian Labor Association Has Alleged Article III Standing To Seek Both Damages And Retrospective Relief

The defendants try to defeat the CLA's standing by denying that the project labor agreements required the CLA's members to *join* a Council-affiliated union as a condition of working on the defendants' public-works projects. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 14. But they still required the CLA's members to *pay* those unions as a condition of work, and that is all that is needed to show that the CLA's members (and the CLA itself) had standing at the time this lawsuit was filed. *See* Part I.A, *supra*.

### C. The Contractor Plaintiffs Have Alleged Article III Standing To Seek Both Damages And Retrospective Relief

The complaint specifically alleges that each of the contractor plaintiffs has been "prevented from obtaining past work from on account of the defendants project labor agreement." *See* Complaint (ECF No. 1) at ¶ 34. That indisputably establishes a past "injury in fact," which is fairly traceable to the defendants, and it can be redressed by an award of nominal or compensatory damages. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021).

The contractor plaintiffs also have standing to seek prospective relief against the future enforcement of the PLAs. A plaintiff seeking prospective relief needs

only to allege that it is "able and ready" to apply for contracts from the defendants. *See Carney v. Adams*, 141 S. Ct. 493, 499–500 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). And a plaintiff satisfies this standard if it is "likely to apply" for work from the defendants "in the reasonably foreseeable future" if the PLAs are set aside or enjoined. *Carney*, 141 S. Ct. at 499–500. The contractor plaintiffs have alleged exactly that, and this allegation *must* be accepted as true on a motion to dismiss. *See* Complaint (ECF No. 1) at ¶ 33 ("Plaintiffs Kaski, Nordic Group, and Roen Salvage are likely to bid on the defendants' public-works projects in the reasonably foreseeable future, and each of them is able and ready to apply for that work.").

The complaint is not required to allege that the contractor plaintiffs "perform work in Duluth, Cloquet or Two Harbors, or for the Sanitary District." Defs.' Mot. to Dismiss (ECF No. 26) at 16. It is enough for the complaint to allege that the contractor plaintiffs are "likely to bid on the defendants' public-works projects in the reasonably foreseeable future," and are "able and ready to apply for that work." *See* Complaint (ECF No. 1) at ¶ 33; *see also Carney*, 141 S. Ct. at 499–500. Nor does the complaint need "allegations that Duluth, Cloquet, Two Harbors or the Sanitary District has used a PLA on any particular projects." Defs.' Mot. to Dismiss (ECF No. 26) at 16. The complaint alleges that the defendants impose their PLA on projects that the contractor plaintiffs are "likely" and "able and ready" to bid upon, and the plaintiffs need not identify specific projects covered by the PLAs at this stage of the proceedings. *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations" (citation and internal quotation marks omitted)).

The defendants claim that the contractor plaintiffs "have identified no conduct by Defendants that limits their ability to bid for work." Defs.' Mot. to Dismiss (ECF No. 26) at 17. But the fact that the contractor plaintiffs are *allowed to bid* does not mean that are not *injured* by the PLAs. The contractor plaintiffs can submit bids, but they can't *obtain work* unless they obtain workers through the Council-affiliated unions' job-referral systems rather than use their own employees on the job. That indisputably inflicts injury in fact. Allowing a non-union contractor to bid, while simultaneously telling the contractor that it cannot use his own employees on the job unless those employees pay a Council-affiliated union and obtain referrals from those unions' hiring halls, inflicts Article III injury on those contractors. And the defendants' quote from *Boston Harbor* has no bearing whatsoever on the question of Article III standing;[3] the language that they quote from the opinion pertained only to the legality of the disputed project labor agreement under the NLRA, which goes to the merits and has nothing to do with standing.

The defendants also claim that the alleged injuries to the contractor plaintiffs are not "traceable" to the conduct of the defendants, but are instead "the

---

3.  Defs.' Mot. to Dismiss (ECF No. 26) at 18 ("As the Supreme Court observed in *Boston Harbor*, when a public entity chooses to use a PLA on its construction project, 'those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a [PLA.]' 507 U.S. at 231.").

result of their own choices." Defs.' Mot. to Dismiss (ECF No. 26) at 19. That contention is absurd. It is the project labor agreements—and the defendants' enforcement of those agreements—that prevents the contractor plaintiffs from working on the defendants' construction projects unless they agree to recognize a Council-affiliated union as the representative of their employees, and use workers referred from union-hiring halls rather than their own employees. A contractor that declines to seek or obtain work under such conditions has suffered injury in fact, just as anyone else who decides that they are unwilling to accede to an onerous or unacceptable condition of employment. The defendants are correct to observe that the contractor plaintiffs are faced with a choice under the PLAs, but the imposition of that choice is what inflicts injury in fact—and that injury is squarely attributable to the defendants and their enforcement of the project labor agreements.

Finally, the defendants try to get around *Carney v. Adams*, 141 S. Ct. 493, 499–500 (2020), by observing (correctly) that Supreme Court refused to allow "unadorned assertions" to establish standing in that case. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 19. But that it because the Supreme Court was reviewing a ruling that *granted summary judgment* to the plaintiff in that case. *See Carney*, 141 S. Ct. at 497–98. A plaintiff who is seeking summary judgment must *prove* Article III standing with evidence in the record, and the Supreme Court reviewed the record and found the plaintiff's evidence insufficient. *See id*. at 501 ("[T]he record evidence fails to show that, at the time he commenced the lawsuit, Adams was 'able and ready' to apply for a judgeship in the reasonably foreseeable future."). This case is at the motion-to-dismiss stage,

where the plaintiffs' allegations must be accepted as true and where mere as-sertions are enough to carry the day. *See Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1927 (2019) ("Because this case comes to us on a motion to dismiss, we accept the allegations in the complaint as true."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (holding that Article III's standing requirements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."). The defendants get nowhere by trying to use *Carney* to imply that something more than allegations are needed to survive a motion to dismiss.

## II. The Defendants' Post-Filing Amendments To The PLAs Do Not Moot The Plaintiffs' Claims For Prospective Relief

When the plaintiffs filed their lawsuit, the defendants' PLAs required union "membership" as a condition of working on the defendants' public-works pro-jects. But the defendants amended their PLAs in response to the plaintiffs' law-suit, and they claim that the PLAs no longer require employees to join or pay a Council-affiliated union. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 2–6, 11. The defendants now contend that these post-filing maneuvers have eliminated an Article III case or controversy and mooted the plaintiffs' claims for relief.[4]

This is a textbook example of "voluntary cessation." *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power

---

4. The defendants couch their arguments as objections to the plaintiffs' "standing," but they are actually mootness arguments for the reasons ex-plained on pages 2–3, *supra*.

to determine the legality of the practice."); *Friends of the Earth*, 528 U.S. at 189 ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."). The defendants were enforcing a "membership" requirement on each of the disputed PLAs when the plaintiffs sued, and they changed their ways only in response to the plaintiffs' lawsuit. But a defendant cannot escape judicial review by turning on a dime and halting its challenged activities before the courts can rule on the legality of those practices. *See Allen v. Likins*, 517 F.2d 532, 535 (8th Cir. 1975) ("[M]ere voluntary cessation of allegedly illegal conduct does not moot a case" (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)).

More importantly, the post-filing amendments to the PLAs cannot moot the entire lawsuit because: (1) The plaintiffs are seeking to enjoin the enforcement of the union-hiring hall requirements, which remain in Article IV of the PLAs and indisputably inflict injury in fact;[5] and (2) The plaintiffs are seeking *damages* for the defendants' *past* enforcement of the PLAs.[6] These claims for prospective relief (against the hiring-hall requirements) and damages cannot possibly be moot, as the amendments to the PLAs do nothing to eliminate the

---

5.  *See* Complaint (ECF No. 1) at ¶ 22 ("The project labor agreements also require contractors and subcontractors to hire employees who will work on the covered project through the Council-affiliated unions' job-referral system."); *id.* at ¶ 35 ("The project labor agreements also compel each of the employee plaintiffs to obtain employment through the Council-affiliated unions' job-referral systems if they want to perform any work on the defendants' public-works projects. This inflicts injury in fact.").

6.  *See* Complaint (ECF No. 1) at page 2, ¶¶ 34, 36, 42, 49, 51(d).

injuries caused by *these* alleged violations of federal law. So the Court's jurisdiction to consider the plaintiffs' claims for both damages and prospective relief is entirely secure — and that remains the case if the defendants find some way to avoid the voluntary-cessation doctrine. That only aspect of this case that the defendants can hope to "moot" is the plaintiffs' effort to enjoin the continued enforcement of the union-security clauses. Yet the Court will *still* have jurisdiction to consider the plaintiffs' claims for damages, as well as their attacks on the continued enforcement of the union hiring-hall requirements.

Later in their brief, the defendants make a more limited argument, claiming that their post-filing amendments moot only the claims that attack the constitutionality of the union-security clauses. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 20. The defendants acknowledge the voluntary-cessation doctrine but rely on *Libertarian Party of Arkansas v. Martin*, 876 F.3d 948, 951 (8th Cir. 2017), which holds that "statutory changes that discontinue a challenged practice are usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed." (citation and internal quotation marks omitted)). The problem with this argument is there were no *statutory* changes made; three of the defendants amended their PLAs by passing city-council resolutions,[7] and a fourth defendant (Western Lake Superior Sanitary District) appears to have amended its PLA through unilateral action.[8] The defendants try to insist that *any* change to government "policies"

---

7.  *See* Declaration of Chelsea J. Helmer (ECF No. 27); Declaration of Tim Peterson (ECF No. 29); Declaration of Dan Walker (ECF No. 30).

8.  *See* Declaration of Marianne Bohren (ECF No. 31). Bohren's declaration merely attaches what she claims is the "current" PLA for the Western Lake

should moot a case—regardless of whether those changes were done through statutory enactment. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 21 (quoting *Troiano v. Supervisor of Elections in Palm Beach County*, 382 F.3d 1276, 1283 (11th Cir. 2004)). But that stance is impossible to square with *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), which emphatically rejected a municipality's efforts to "moot" a constitutional challenge to one of its policies by unilaterally ceasing the enforcement of that policy in response to litigation:

> In challenging standing, Seattle also notes that it has ceased using the racial tiebreaker pending the outcome of this litigation. But the district vigorously defends the constitutionality of its race-based program, and nowhere suggests that if this litigation is resolved in its favor it will not resume using race to assign students. Voluntary cessation does not moot a case or controversy unless "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," a heavy burden that Seattle has clearly not met.

*Id.* at 719. *Parents Involved* holds that a unilateral change to a municipal policy cannot "moot" a claim unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"—the normal standard that applies when evaluating a defendant's voluntary cessation. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("[T]he standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case

---

Superior Sanitary District, without saying whether it was amended in response to this litigation. But neither Bohren nor any of the defendants dispute the plaintiffs' claim that the Western Lake Superior Sanitary District was enforcing a union-security clause in its PLA at the time the lawsuit was filed.

might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)). And in these situations, the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* (cleaned up) (citation and internal quotation marks omitted).

The defendants turn this rule upside down by insisting that the *plaintiffs* must show that it is "virtually certain" that the defendants would *reinstate* the union-security provisions if the case were dismissed. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 21–22. That is the rule that applies when a *statutory* change has repealed the challenged law or eliminated any possibility of future enforcement. *See Libertarian Party of Arkansas*, 876 F.3d at 951. But *Parents Involved* holds that a mere change in municipal policy—rather than an amendment to a statute—is governed by the normal regime that requires the defendant to prove mootness and demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Parents Involved*, 551 U.S. at 719.

The defendants have not shown that it is "absolutely clear" that the union-security provisions will never be reenacted. The city councils of Duluth, Cloquet, and Two Harbors took these actions in response to this lawsuit and at the request of the Duluth Building and Construction Trades Council, which sent letters to each of three cities urging them to repeal the union-security clauses. *See* Declaration of Craig Olson (ECF No. 28). None of the declarations from

any of three city officials disclaim an intent to re-enact the union-security clauses in the future. And nothing in Mr. Olson's declaration suggests that the Council has permanently renounced its support for union-security clauses, nor does it deny that the Council might ask for those provisions to be restored to the PLAs if there were a significant change of membership on the Supreme Court or the Eighth Circuit. The defendants have produced no evidence or declarant testimony to dispel the impression that these post-filings amendments to the PLAs were made only to avoid a likely defeat given the current makeup of the federal courts, and they make no effort to deny that the union-security provisions will reappear if the Supreme Court or the Eighth Circuit ever returns to Democratic control.

Finally, the defendants seem to have ignored the fact that the plaintiffs are also seeking *damages* for the defendants' *past* enforcement of the union-security clauses. *See* Complaint (ECF No. 1) at page 2, ¶¶ 34, 36, 42, 49, 51(d). The defendants' post-filing amendments to their PLAs can do nothing to "moot" the plaintiffs' claims for relief regarding the past injuries that they have suffered. Yet the defendants are contending that the plaintiffs "constitutional claims"[9] involving the union-security clauses should be dismissed as moot, even though these "constitutional claims" encompass claims for retrospective relief that cannot possibly become moot on account of the defendants' actions.

---

9.   *See* Defs.' Mot. to Dismiss (ECF No. 26) at 23.

### III. Only One Plaintiff In Each Case Needs Article III Standing To Seek Prospective Relief

Each of the plaintiffs is seeking the same prospective relief against the defendants: a declaratory judgment and an injunction against the continued enforcement of the project labor agreements. *See* Complaint (ECF No. 1) at ¶ 51(a)–(c). So only *one* of the plaintiffs in this case needs Article III standing to seek prospective relief, and if a single plaintiff has alleged standing then none of the remaining plaintiffs should be dismissed on standing grounds. *See Little Sisters of the Poor*, 140 S. Ct. at 2379 n.6 ("Under our precedents, at least one party must demonstrate Article III standing for each claim for relief. . . . The Third Circuit accordingly erred by inquiring into the Little Sisters' independent Article III standing."); *see also Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

The defendants do not acknowledge the holding from *Little Sisters*, which forbids lower courts to dismiss litigants for lack of Article III standing whenever another litigant who is seeking identical relief has established standing to sue. But the holding remains binding regardless—and this Court should not dismiss *any* of the litigants if it concludes that even one of them has alleged standing to seek prospective relief.

### IV. The Plaintiffs Have Alleged Violations Of The First And Fourteenth Amendments

The defendants do not even attempt to defend the constitutionality of the union-security clauses in the wake of *Janus*; they insist only (and incorrectly) that the Court lacks jurisdiction to consider those constitutional arguments. We have refuted those contentions in Sections I–III, *supra*, and unless this

Court concludes that the plaintiffs lack standing to seek *any* type of relief (both damages and prospective relief) on those claims, there appears to be no dispute that the plaintiffs have alleged violations of the First and Fourteenth Amendments to the extent they challenge the constitutionality of the union-security clauses. The defendants claim that the union-security clause merely requires workers to *pay* (and not join) a Council-approved union,[10] but that does nothing to refute the plaintiffs' First Amendment claims because a mere requirement to pay a union as a condition of working on a public-works project violates the Constitution as much as a requirement to join. *See Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448 (2018).

The defendants are wrong to accuse the employee plaintiffs of challenging the constitutionality of exclusive representation. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 23–25. There is nothing in the plaintiffs' complaint that seeks the overruling of *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984). And there is nothing in Claim No. 1 that criticizes exclusive representation or suggests that that the PLAs violate the employee plaintiffs' rights by forcing them to accept a Council-affiliated union as their bargaining representative. See Complaint (ECF No. 1) at ¶¶ 37–43. The plaintiffs' First Amendment claim attacks the requirement that employees join or pay a Council-affiliated union as a condition of working the defendants' public-works projects. That indisputably states a claim on which relief may be granted, and the defendants do not argue otherwise.

---

10. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 23.

## V.    THE PLAINTIFFS HAVE ALLEGED AN ANTITRUST CLAIM

The defendants claim that: (1) the plaintiffs have failed to allege a violation of the Sherman Act; (2) the plaintiffs have failed to allege antitrust standing; (3) the non-statutory labor exemption bars the plaintiffs' antitrust claim. None of these arguments have merit.

### A.    The Plaintiffs Have Alleged A Violation Of The Antitrust Laws

The defendants are demanding more detailed allegations than the rules of notice pleading require. The complaints specifically describe the alleged agreements in restraint of trade: The project labor agreements between the defendants and the Council. They even attach a copy of the alleged unlawful agreements as exhibits to the complaints. That is more than enough to "provide fair notice of 'what the . . . claim is and the grounds upon which it rests.'" *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). And the Supreme Court's ruling in *Connell* is all that the plaintiffs need to "raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]." *Thompson v. Real Estate Mortgage Network*, 748 F.3d 142, 147 (3d Cir. 2014) (citation and internal quotation marks omitted)).

The plaintiffs do not need to *prove* their antitrust claims in the complaint. They need only to *allege* a violation of the antitrust laws in a manner that confers fair notice. If the defendants believe that their project labor agreement is justified under the rule of reason, then they can move for summary judgment after producing evidence that proves the agreement's reasonableness. They cannot ask this Court to assume that the project labor agreement satisfies the rule

of reason and then deny the plaintiffs discovery on this question. At the pleading stage, a plaintiff needs only to allege "'enough fact to raise a reasonable expectation that discovery will reveal evidence of' the violation.' *McDonough v. Anoka County*, 799 F.3d 931, 945 (8th Cir. 2015) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The plaintiffs have done more than enough to get to discovery by describing the project labor agreements in detail and attaching them as exhibits. This is not a situation like *Twombly*, where the plaintiffs had alleged no evidence whatsoever of an agreement to restrain trade.

The plaintiffs are also not required to spell out their legal theory of antitrust liability in the complaint. The federal rules of civil procedure are not a code-pleading regime, and it is sensible for complaints to merely sketch the outlines of the plaintiffs' claims while preserving flexibility as discovery and fact development unfold. *See Sanjuan v. American Board of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (Easterbrook, J.) ("Any need to plead facts that, if true, establish each element of a 'cause of action' was abolished by the Rules of Civil Procedure in 1938, which to signify the radical change from code pleading also replaced 'cause of action' with 'claim for relief.' See *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). One pleads a 'claim for relief' by briefly describing the events."). There is no requirement that a plaintiff spell out each element of a cause of action and explain how it will be satisfied, and a plaintiff does not need to show his cards before taking discovery and tailoring his legal theories to the discovered facts. If the plaintiffs decide to pursue a rule-of-reason claim under section 1 or a monopolization claim under section 2, then they can define the relevant 'market' at summary

judgment; there is no requirement that they do so in the complaint. *See, e.g.,* *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018) ("[C]ourts are cautious before dismissing for failure to define a relevant market.").

The defendants are also wrong to assume that the rule of reason will apply. Many agreements (such as price-fixing) are *per se* unlawful under section 1, and discovery is needed to determine whether this project labor agreement falls within the 'unlawful per se' or the 'rule of reason' cubbyhole. The project labor agreements fix prices on their face, by compelling contractors and subcontractors to pay the union-dictated wage and benefit rates to their employees. *See* City of Cloquet PLA (ECF No. 1-1), article II, § 9 ("[A]ny Contractor performing work on the Project which is not party to a Local Area Labor Agreement for a craft employed by the Contractor, agrees to install hourly wage rates, hours, fringe benefit contributions, referral procedures and all other terms and conditions of employment as fully set forth in the applicable Local Area Agreement as described in Schedule A for work on the Project for each craft employed by the Contractor."); City of Cloquet PLA (ECF No. 1-2), article II, § 9 (same); City of Two Harbors PLA (ECF No. 1-3) (similar); WLSSD PLA (ECF No. 1-4), article II, § 4 ("All employees covered by this Agreement shall be classified in accordance with work performed and paid the base hourly wage rates for those classifications as specified in the attached Schedule A.").

An agreement of that sort—which compels competing contractors (and subcontractors) to promise each other that they will pay their employees in accordance with an agreed-upon wage and benefit scale—is the very definition

of price fixing, and it is *per se* illegal. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ('Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful.'); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 347 (1982) ('We have not wavered in our enforcement of the *per se* rule against price fixing.'). The defendants cannot seek dismissal on rule-of-reason grounds when the project labor agreements fix prices among competitors, and when the defendants have presented no argument to escape the *per se* condemnation of price-fixing arrangements.

Finally, the defendants are flatly wrong to say that we have failed to allege an "'adverse effect on competition.'" Defs.' Mot. to Dismiss (ECF No. 26) at 26 (quoting *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 488 (8th Cir. 1985)). The complaint is replete with allegations that the PLAs have hindered competition by preventing non-union contractors and their employees from competing with Council-affiliated contractors in their efforts to obtain work on the defendants' construction projects. *See, e.g.*, Complaint (ECF No. 1) at ¶ 24 ("This precludes non-union workers—as well as workers who belong to unions that are not affiliated with the Duluth Building and Construction Trades Council—from working on any public-works project subject to the PLA."); *id.* at ¶ 34 ("Plaintiffs Kaski, Nordic Group, and Roen Salvage have . . . been prevented from obtaining past work on account of the defendants' project labor agreements.").

### B. The Plaintiffs Have Alleged Antitrust Standing

The plaintiffs have alleged antitrust injury and antitrust standing because they have alleged that the project labor agreements prevent and deter them from bidding and working on the defendants' construction projects—the precise type of competitive harm that the antitrust laws were designed to prevent. *See S.D. Collectibles, Inc. v. Plough, Inc.*, 952 F.2d 211, 213 (8th Cir. 1991) ("[A]ntitrust injury . . . is 'injury of the type the antitrust laws were intended to prevent.'" (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

The defendants claim that the employee plaintiffs are alleging nothing more than "derivative" injuries that their employers suffered on account of the PLAs,[11] but that is untrue. The employee plaintiffs are the ones who are (or were) compelled by the PLAs to join or pay a Council-affiliated union as a condition of performing city work, and these compulsory union-affiliation requirements are directed at the employees themselves. They are not alleging a mere "derivative" injury in this litigation.

The defendants also invoke section 8(f) of the NLRA in an attempt to show that Congress has explicitly authorized the defendants' project labor agreements—claiming that "antitrust standing" cannot be based on injuries caused by congressionally approved activities. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 30 (citing 29 U.S.C. § 158(f). But the defendants blatantly misrepresent the statute, which says:

---

11. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 30 (citing *Peterson v. General Motors Corp.*, 975 F.2d 518, 520 (8th Cir. 1992)).

It shall not be an unfair labor practice under subsections (a) and (b) of this section *for an employer engaged primarily in the building and construction industry* to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry *with a labor organization of which building and construction employees are members* (not established, maintained, or assisted by any action defined in subsection (a) as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3): *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

29 U.S.C. § 158(f). This provision shields only agreement between unions and "employers engaged primarily in the building and construction industry"— and none of the defendants is an employer engaged primarily in the building and construction industry.

The defendants repeat their astounding claim that contractor plaintiffs' alleged injuries do not arise "from any restriction on competition." Defs.' Mot. to Dismiss (ECF No. 26) at 32. Yet the complaint repeatedly explains how the

project labor agreements place non-union contractors at a *competitive disadvantage* when bidding for the defendants' projects because they cannot use their own employees and must instead use workers referred from the unions' hiring halls. *See* Complaint (ECF No. 1) at ¶ 32. In addition, the text of the PLAs attached to the complaint shows that the contractor plaintiffs must pay their employees according to the union wage-and-benefit scale as a condition of working on the defendants' projects. *See supra* at 19. How can the defendants possibly deny that this is an injury to competition?

### C. The Non-Statutory Labor Exemption Is Inapplicable To The Plaintiffs' Antitrust Claims

The Supreme Court's ruling in *Connell* clearly and unequivocally rejects the defendants' efforts to extend the non-statutory labor exemption to their project labor agreements. *See Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621–26 (1975). The union in *Connell* had pressured a general contractor into signing an agreement that promised to subcontract all of its mechanical work to subcontractors who were parties to the union's collective-bargaining pact. The general contractor signed the agreement under protest and then sued the union, claiming that its tactics and the resulting agreement violated the antitrust laws. The Supreme Court held that the agreement—and the union's behavior that coerced the general contractor into signing the agreement—were subject to federal antitrust scrutiny, and it rejected the union's reliance on the so-called labor exemption. *See id.* at 621–26.

The statutory labor exemptions to the antitrust laws do not exempt agreements between unions and nonlabor parties, such as municipalities or government-controlled entities. *See* 15 U.S.C. § 17 (section 6 of the Clayton Act); 29 U.S.C. § 52 (section 20 of the Clayton Act); 29 U.S.C. §§ 104, 105, and 113 (Norris–LaGuardia Act). Yet *Connell* went on to hold that even the non-statutory labor exemption provides no shield to agreements between contractors and unions that restrain competitive bidding. The Court wrote:

> Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, *e.g.*, *Federation of Musicians v. Carroll*, 391 U.S. 99 (1968), the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market.

*Id.* at 622–23. Then the Court condemned the agreement to exclude nonunion subcontractors as an unwarranted and unlawful restraint on trade:

> The agreements with Connell and other general contractors indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods. Curtailment of competition based on efficiency is neither a goal of federal labor policy nor a necessary effect of the elimination of competition among workers. Moreover, competition based on efficiency is a positive value that the antitrust laws strive to protect. . . . Here Local 100, by agreement with several contractors, made nonunion subcontractors ineligible to compete for a portion of the available work. This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree

not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

*Id.* at 623, 625.[12] This language from *Connell* is directly applicable to project labor agreements, which curtail competition by preventing non-union contractors from using their own employees on a municipality's construction work.

The defendants' claim that the project labor agreements "grew out of" and "was directly related to" the lawful operation of the collective-bargaining process is untenable. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 34 (quoting *Brown v. Pro Football, Inc.*, 518 U.S. 231, 250 (1996)). Collective bargaining occurs when an employer negotiates with the union that represents its employees. Project labor agreements, on the other hand, are agreements between a municipal entity and a consortium of unions that do not represent *any* of the municipality's employees, and these agreements have nothing to do with the terms of and conditions of municipal employment. Instead, they are price-fixing measures that seek to control the terms of employment for municipal *contractors*, and that hinder non-union contractors and employees from competing with union-affiliated entities for municipal contracts. There was *no* collective bargaining that occurred between the defendants and the Duluth Building and Construction Trades Council.

And in all events, *Connell* makes clear that the non-statutory labor exemption will *not* extend to project labor agreements, in which a contractor or gov-

_____

12. The *Connell* opinion goes on to consider whether the agreement might be shielded by the construction-industry proviso to section 8(3) of the National Labor Relations Act, *see Connell*, 421 U.S. at 626–35, but none of that discussion is relevant because the defendants are not "employers in the construction industry." *See* Section IV, *supra*.

ernment entity promises to restrain competition when soliciting bids for contracts. That remains the case even when a union (or a council of affiliated unions) is a party to the agreement. The non-statutory labor exemption will protect collective-bargaining agreements between a private employer and the union representing its employees. *See Connell*, 421 U.S. at 622. But it does *not* authorize agreements that restrain competition among contractors or subcontractors that bid for a municipality's work.

The defendants also rely on *Boston Harbor*,[13] but that ruling has nothing to say about the plaintiffs' antitrust claims or the scope of the non-statutory labor exemption. The litigants in *Boston Harbor* never even raised an antitrust claim, so the Court has no occasion to rule on these issues. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Waters v. Churchill*, 511 U.S. 661, 678 (1994) (plurality opinion) ("[C]ases cannot be read as foreclosing an argument that they never dealt with."); *see also Direct Marketing Ass'n v. Brohl*, 135 S. Ct. 1124, 1131 n.1 (2015). The defendants appear to be assuming that a project labor agreement cannot violate the antitrust laws unless it also violates the NLRA—and that the non-statutory labor exemption protects all labor activity that is not affirmatively prohibited by federal labor statutes. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 35. That is demonstrably untrue. To begin, the non-statutory labor exemption shields only collective-bargaining activity from antitrust scrutiny. *See Connell*, 421 U.S. 616, 625–26

---

13. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 34–35.

(1975) ("[A] restraint of this magnitude might be entitled to an antitrust exemption *if it were included in a lawful collective-bargaining agreement.* In this case, Local 100 had no interest in representing Connell's employees. *The federal policy favoring collective bargaining* therefore can offer no shelter for the union's coercive action against Connell or its campaign to exclude nonunion firms from the subcontracting market." (citations omitted) (emphasis added)); *id.* at 635 ("We therefore hold that this agreement, *which is outside the context of a collective-bargaining relationship* and not restricted to a particular jobsite . . . may be the basis of a federal antitrust suit"); *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236 (1996) ("The Court has implied this [non-statutory labor] exemption from federal labor statutes, which set forth a national labor policy favoring free and private *collective bargaining.*" (emphasis added)); *id.* at 237 ("As a matter of logic, it would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with each other *any* of the competition-restricting agreements potentially necessary to make the process work or its results mutually acceptable. Thus, the implicit exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions."); *Associated Builders & Contractors, Inc. v. City of Seward*, 966 F.2d 492, 498 (9th Cir. 1992) ("[T]he Supreme Court has recognized a non-statutory exemption from antitrust liability *for collective bargaining agreements.*" (emphasis added)). More importantly, the non-statutory labor exemption protects only collective-

bargaining activities *in the private sector*, so it has nothing to say when a *governmental entity* agrees with a labor union to restrict competition among government contractors. *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 236 (1996) ("The Court has implied this [non-statutory labor] exemption from federal labor statutes, which set forth a national labor policy favoring free *and private* collective bargaining." (emphasis added)). And the defendants are flatly wrong to say that their project labor agreements were "explicitly" authorized by Congress. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 30 (citing 29 U.S.C. § 158(f)). There is nothing in the NLRA that "explicitly" authorizes a project labor agreement, and *Boston Harbor* merely held that the NLRA did not preempt the PLA at issue in that case. *See Boston Harbor*, 507 U.S. at 230–33. Indeed, *Boston Harbor* specifically denied that the NLRA "explicitly authorized" the disputed project labor agreement. *See id.* at 230–31 ("Of course, the exceptions provided for the construction industry in §§ 8(e) and (f), like the prohibitions from which they provide relief, are not made specifically applicable to the State. This is because the State is excluded from the definition of the term "employer" under the NLRA, *see* 29 U.S.C. § 152(2), and because the State, in any event, is acting not as an employer but as a purchaser in this case.").

The defendants cite *Associated Builders & Contractors, Inc. v. City of Seward*, 966 F.2d 492, 498 (9th Cir. 1992), and *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 241 (7th Cir. 1996), but neither of these cases supports the defendants' position. *City of Seward* invoked the non-statutory labor exemption to shield the terms of a *collective-bargaining agreement* from antitrust scrutiny. *See City of Seward*, 966 F.2d at 498 ("The Contractors'

second claim is that Seward's *CBA* with the IBEW violates the Sherman Anti-trust Act. . . . The Contractors' reliance on these cases is misplaced because the Supreme Court has recognized a non-statutory exemption from antitrust lia-bility for *collective bargaining agreements*." (emphasis added)); *Ehredt* likewise holds that the non-statutory labor exemption will apply in cases "where the injury stemmed directly *from a collective bargaining agreement*." *Ehredt*, 90 F.3d at 241 (emphasis added). There is no dispute between the parties that the non-statutory labor exemption can protect the terms of a collective-bargaining agreement from antitrust scrutiny, *see Brown*, 518 U.S. at 236–37, but none of that is any help to the defendants because the defendants' project labor agree-ments are *not* the product of collective bargaining. And even if they were, the National Labor Relations Act has nothing to say about the labor practices of a *governmental entity* such as the defendants. *See* 29 U.S.C. § 152(2) ("The term 'employer' . . . shall not include . . . any State or political subdivision thereof"); *Brown*, 518 U.S. at 236 ("The Court has implied this [non-statutory labor] exemption from federal labor statutes, which set forth a national labor policy favoring free *and private* collective bargaining." (emphasis added)). The NLRA cannot shield a governmental entity's agreements from antitrust scrutiny when it does even authorize those entities to engage in collective bargaining.

Finally, the defendants try to distinguish *Connell* by observing that the agreement in that case also violated the NLRA. *See* Defs.' Mot. to Dismiss (ECF No. 26) at 36 n.11. That does nothing to show that the non-statutory labor exemption should protect the PLAs from antitrust scrutiny. That an agreement violates federal statutes is sufficient (but not necessary) to defeat an invocation

of the nonstatutory labor exemption. What matters is whether the alleged anti-competitive agreement is a product of the private-sector collective bargaining authorized by federal labor statutes. *See Brown*, 518 U.S. at 236–37. And neither the PLAs in this case nor the behavior in *Connell* can qualify for an exemption under that standard.

## CONCLUSION

The defendants' motion to dismiss should be denied.

Respectfully submitted.

Walter S. Zimolong*
Pennsylvania Bar No. 89151
Zimolong LLC
P.O. Box 552
Villanova, PA 19085
(215) 665-0842 (phone)
wally@zimolonglaw.com

Thomas R. Revnew
Minnesota Bar No. 0295620
Peters, Revnew, Kappenman
& Anderson, P.A.
7300 Metro Boulevard, Suite 500
Minneapolis, Minnesota 55439
(952) 921-4622 (phone)
(952) 896-1704 (fax)
trevnew@prkalaw.com

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell*
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

* admitted *pro hac vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the word limits in Local 7.1(f) because it contains 8,479 words, as calculated by Microsoft Word for Mac version 16.48. I further certify that the word-count function was applied specifically to include all text, including headings, footnotes, and quotations.

I certify that this document complies with the type-size limit of Local Rule 7.1(h) because it was produced using the font ITC Galliard Pro in 13 point.


 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I certify that on May 10, 2021, I served this document through CM/ECF

upon:

ELIZABETH A. SELLERS
Assistant City Attorney
411 West First Street, Room 440
Duluth, Minnesota 55802
(218) 730-5281
esellers@duluthmn.gov

*Counsel for Defendant City of
Duluth*

MONTE A. MILLS
Greene Espel PLLP
222 South Ninth Street, Suite 2200
Minneapolis, Minnesota 55402
612-373-0830
mmills@greeneespel.com

*Counsel for Defendants City of
Cloquet, City of Two Harbors, and the
Western Lake Superior Sanitary
District*

VICTORIA L. BOR
JONATHAN D. NEWMAN
Sherman Dunn, P.C.
900 Seventh Street NW, Suite 1000
Washington, DC 20001
(202) 785-9300
bor@shermandunn.com
newman@shermandunn.com

*Counsel for Defendant Duluth
Building and Construction Trades
Council*

 /s/ Jonathan F. Mitchell 
JONATHAN F. MITCHELL
*Counsel for Plaintiffs*